**NU–WAY SERVICES, INC.,**
Plaintiff-Respondent,

v.

**MERCANTILE TRUST COMPANY NATIONAL ASSOCIATION,**
Defendant-Appellant.

No. 36242.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Dec. 2, 1975.

744

Thompson & Mitchell, W. David Wells, Charles A. Newman, Donald B. Dorwart, St. Louis, for defendant-appellant.

Leadlove & Byrne, James M. Byrne, Steven T. Biesanz, St. Louis, for plaintiff-respondent.

GUNN, Judge.

Plaintiff-respondent Nu-Way Services, Inc. (Nu-Way) sued defendant-appellant Mercantile Trust Company National Association (Mercantile) to recover charges against Nu-Way's account made by Mercantile on 43 forged and six altered checks. The jury returned a verdict for $7,903.29 in favor of Nu-Way, and on Mercantile's motion for new trial, the trial court granted a new trial as to damages only. Mercantile has appealed alleging: 1) that under § 400.-4–406(3)[1] of the Uniform Commercial Code, Nu-Way failed to establish lack of ordinary care on the part of Mercantile in paying on the forged and altered checks; 2) that the trial court erred in limiting a new trial to the issue of damages only. For the reasons which follow, we find that Nu-Way is entitled to recover on the altered checks but not on the forgeries. We therefore reverse and remand.

Nu-Way, a truck repair company, maintained a checking account with Mercantile. The signature card for Nu-Way's president, Mariano Costello, was kept on file by the bank. Each month, Nu-Way wrote approximately 175 checks on its account, and Mercantile sent Nu-Way a monthly statement indicating the fluctuating checking account balance as each check was charged against the account with the cancelled checks being returned with the statement.

In an altruistic gesture designed for the rehabilitation of a former convict, Mr. Costello hired James Ussery as night manager for Nu-Way. Part of Ussery's duties entailed obtaining automotive parts from parts companies. Mr. Costello would on occasion date and sign checks and fill in the name of the payee (always a parts company) for payment of parts used by Nu-Way, and the amount of the check would be left blank for Ussery to fill in when the cost of the parts was determined at the time they were picked up by him. On seven such checks which Mr. Costello had signed, Ussery made alterations to substitute his name as payee and cashed the checks for his own benefit. Ussery also had unauthorized access to Nu-Way's checkbook and removed a substantial number of blank checks therefrom. Ussery made use of 43 of the blank checks by forging Mr. Costello's signature on them after making himself the payee. The dates on the altered and forged checks were from July 29, 1971 to January 13, 1972.

Each of the forged checks was returned to Nu-Way by Mercantile along with an itemized statement of account at the end of each month the checks were cashed. And each month Mr. Costello would have a company clerk compare the amount of the checks with the statements. At Mr. Costello's direction the bookkeeping employee merely compared the amount of the checks with the statements looking only for mathematical computation errors by Mercantile. None of the Nu-Way employees, including Mr. Costello, examined any of the checks for forgeries or alterations nor compared the checks with the company checkbook. Ultimately, one of Nu-Way's vendors called Mr. Costello's attention to a check made

1. Statutory references are to RSMo. 1969.

payable to Ussery, and an investigation revealed the alterations and forgeries. Mercantile was notified of the irregularities and subsequently reimbursed Nu-Way for $231 to cover the amount of the first check altered by Ussery. Nu-Way brought suit to recover the amount paid out on its checking account on the forged and altered checks. The jury awarded Nu-Way $1,438.29 on the altered checks, which included the full amount of the altered checks, less the $231 previously paid by Mercantile, and $6,565 on the forgeries, although the total sum of the 43 forged checks was $10,716.66. The trial court ordered a new trial on the issue of damages only having found that it erroneously omitted a portion of MAI 4.01 in the given instruction. Mercantile's two grounds of appeal are that under § 400.4–406 of the Uniform Commercial Code there should have been no recovery against it and that the trial court was in error in limiting the new trial on the issue of damages only.

In its argument that it has no liability to Nu-Way for the payments made on the altered and forged checks, Mercantile relies on § 400.4–406, which in pertinent part provides:

"(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

"(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

(a) his unauthorized signature or any alteration on the item if the bank also

establishes that it suffered a loss by reason of such failure; and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

"(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the items."

Nu-Way concedes that under the facts of this case that § 400.4–406(3) places the burden upon it of proving that Mercantile lacked ordinary care in paying on the altered and forged checks. We find as a matter of law that Nu-Way failed in this case in its proof of lack of ordinary care by Mercantile as to the 43 forged checks but that there was sufficient evidence to uphold the jury verdict of $1,438.29 as to the alterations.

The paucity of Missouri legal rubric touching the issues confronting us in this case requires our reference to decisions in other jurisdictions for guidance. We first consider the question of Mercantile's liability on the 43 forged checks. The fundamental rule in the Uniform Commercial Code regarding unauthorized signatures is stated in § 400.3–404(1) as follows:

"Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it . . . ."

It is accepted that Ussery's forgeries of Mr. Costello's signature were unauthorized and would therefore be "wholly inoperative" as to Nu-Way unless Nu-Way is "precluded from denying it." § 400.4–406 relates directly to the relationship between depositor and bank and affords an apt guide for determining whether a basis exists for precluding Nu-Way's denial of the signatures.

*Hardex–Steubenville Corp. v. Western Pennsylvania National Bank*, 446 Pa. 446, 285 A.2d 874, 877 (1971).[2]

■ Initially, we find that Nu-Way failed to meet its obligation under subparagraph (1) of § 400.4–406, in that it did not "exercise reasonable care and promptness to examine the statement and items to discover [the] unauthorized signature . . on an item." In accordance with Mr. Costello's instructions, the Nu-Way clerk in charge of examining the bank statements examined Mercantile's statements to check the accuracy of the mathematics. The "items"—the cancelled checks—were not examined at all. Mr. Costello readily admitted that the checks were not scrutinized for forgeries as required by statute nor was reasonable notice given to Mercantile of any wrongdoing after the first check and statement was made available to Nu-Way within the meaning of § 400.4–406(2)(b). Hence, Nu-Way failed in its duties to discover and report the forgeries under § 400.-4–406(2) and is precluded from recovering against Mercantile unless it can establish under § 400.4–406(3) lack of ordinary care on the part of Mercantile in paying the forgeries.

■ Under § 400.4–406(3) the burden of establishing Mercantile's lack of ordinary care rests staunchly on Nu-Way. *Westport Bank & Trust Co. v. Lodge*, 164 Conn. 604, 325 A.2d 222, 227 (1973); *Huber Glass Co. v. First National Bank of Kenosha*, 29 Wis.2d 106, 138 N.W.2d 157, 160 (1965).[3] Thus, we examine the evidence to determine whether it was sufficient to present a jury question if there was a lack of ordinary care exercised by Mercantile in paying on the forgeries. The method used by Mercantile for detecting forgeries and alterations was to assign a bank clerk to examine the checks

of each of Mercantile's accounts, and the examination was not desultorily performed. The clerk assigned to Nu-Way's account was responsible for approximately 200 accounts and examined all the checks from each account daily. The total number of checks for all accounts examined by the bank clerk totaled between 900–1,000 daily, except on Tuesdays or when another clerk was absent, causing the work load to be substantially increased. Two supervisors were present when the clerk reviewed the checks, but only the clerk in charge of the particular account would actually check for forgeries. Each clerk, including the clerk in charge of the Nu-Way account, had possession of the authorized signature cards for the accounts for which the clerk was responsible and would examine each check on each account. The clerk would look at the signature card while examining the checks until familiarity with the authorized signature was achieved, then the comparison of the signatures on the checks was made based on the memorization of the signature on the signature card. Each clerk, including the Nu-Way clerk, was given a two week training session. Nu-Way's clerk followed the regular procedure and compared Mr. Costello's signature on the forged checks with her memory of Mr. Costello's signature on the authorized signature card. The clerk was unable to detect the forgeries.

After Mr. Costello notified Mercantile that there had been payments made on some forgeries and alterations, the clerk responsible for examining Nu-Way's account and her two supervisors made comparison between the authorized signature card and all Nu-Way's checks for the period covered by the forgeries and alterations and were unable to differentiate between the forgeries and the authorized signature.

2. § 400.3–406 also precludes denial of an unauthorized signature where a person's negligence has substantially contributed to an alteration or forgery, but we believe the provisions of § 400.3–406 do not apply to these facts.

3. *Huber Glass Co. v. First National Bank of Kenosha* was decided on the basis of pre-Uniform Commercial Code law which required that a bank exercise "due diligence." The court noted that the Code specifically placed the burden of proving negligence on the depositor.

The forgeries were sufficiently adroit so as to escape detection even under the supervisors' scrutiny. However, the clerk was reprimanded for allowing the alterations to pass, as erasures appearing on the altered checks were perspicuous.

The only testimony presented by Nu-Way regarding any method used for determining forgeries was the above described method utilized by Mercantile. Additionally, Mercantile presented uncontradicted evidence from one of its officers that the forgery detection method applied by Mercantile— specifically the memory of the signature card method—was substantially the same as employed by other commercial banks in the St. Louis area. An operations officer of another St. Louis bank testified that the method used by Mercantile to detect forgeries by memorization of the authorized signature card was the same as utilized by his bank. Therefore, the only evidence before the jury and this court of any forgery detection method was that applied by Mercantile. And the issue is whether a jury question was presented that such procedure did not constitute ordinary care under § 400.4–406(3). We find in this case that there was no such jury question presented.

There is a seeming conflict of decisions in jurisdictions ruling on the use of the memory of signature cards for forgery detection purposes. In *Jackson v. First National Bank of Memphis, Inc.*, 55 Tenn.App. 545, 403 S.W.2d 109 (1966), a bank was held negligent on a forgery for its failure to compare all checks with the signature cards on file. It was noted, however, that such continuous use of signature cards might be impractical but that a bank had certain obligations to protect its depositors from forgeries. But in the *Jackson* case there was no mention of any surrogate method for examining signatures, where here the means used by Mercantile to search for forgeries was related in elaborate detail.

The means employed by Mercantile provided for a clerk familiar with Mr. Costello's signature to examine each of Nu-Way's checks. Also, in *Jackson*, the court noted that an unfaithful servant of his church— the financial secretary—had been making personal use of church checks; that such personal use was palpable and should have been discovered by the bank, in that the perfidious church official had been cashing the checks at the local dog track. Such obvious illicit conduct was not present here for Mercantile to notice.

Nu-Way also relies on *Exchange Bank & Trust Co. v. Kidwell Constr. Co.*, 463 S.W.2d 465 (Tex.Civ.App.1971), aff'd. 472 S.W.2d 117 (Tex.1971), which held a bank liable for failing to detect forgeries even though the bank's customer did not check its bank statement. But the Exchange Bank case is readily distinguishable, for the forgeries were crude, there was no mention of any substitute detection system, and there was evidence that the volume of checks handled was too great to allow each signature to be checked.[4] Mercantile did examine each of Nu-Way's checks, and the forgeries were so artfully accomplished that even the clerk's supervisors were unable to detect them.

There is also sound authority for holding that the system utilized by Mercantile for detecting unauthorized signatures establishes ordinary care on the part of a bank. *Terry v. Puget Sound National Bank*, 80 Wash.2d 157, 492 P.2d 534 (1972); *Huber Glass Co. v. First National Bank of Kenosha, supra.* In the *Huber Glass Co.* case, it was found that the system utilized by the defendant bank (similar to that applied by Mercantile here) was a reasonable means of inspecting and processing checks and that the bank had met the more strict pre-Uniform Commercial Code burden of proving itself free of negligence by employing such a method as contrasted with current § 400.-4–406(3) requirement placing the burden on

---

**4.** In the *Exchange Bank* case, as well as in the *Jackson* case, it was the perpetrator of the fraud who was in charge of examining the bank statement, who would quite logically conceal his misdeeds, and who was scarcely impartial in his examination of the bank statement. Not so here.

the depositor to prove the bank's negligence.

We have only before us evidence of the method applied by Mercantile in processing Nu-Way's checks. There was no evidence presented by Nu-Way of any other methods employed by other banking institutions. On the record which we review we cannot rule that Mercantile lacked ordinary care in processing Nu-Way's checks. § 400.4–103(3) offers the following partial definition of ordinary care:

> "Action or nonaction approved by this article or pursuant to Federal Reserve regulations or operating letters constitutes the exercise of ordinary care and, in the absence of special instructions, action or nonaction consistent with clearing house rules and the like or with *a general banking usage not disapproved by this article, prima facie constitutes the exercise of ordinary care.*" (emphasis added)

The record contains no references to Federal Reserve regulation or clearing house rules, and the only evidence of "general banking usage" came from Mercantile which described the system administered by it as being in general banking usage. Further, an operating officer of another area bank described his bank's check processing system as the same employed by Mercantile. Nu-Way presented no evidence to refute Mercantile's evidence that the check processing method followed by Mercantile was consistent with general banking usage. By Nu-Way's failure to review its own bank statements when supplied by Mercantile, it had the burden under § 400.4–406(3) to establish lack of ordinary care by Mercantile. On the record before us we conclude that Nu-Way failed to meet its burden as to the 43 forged checks.

■ The matter of the altered checks presents a different question. Whereas the forgeries were skillfully written, the alterations were maladroitly performed and the changes so egregious as to call for the reproval of the bank clerk. The alterations should have been readily discovered, and the bank clerk ignored specific instructions to withhold payment on altered checks. Thus, there was substantial evidence to uphold the jury verdict of $1,438.29 on the alterations. See *Basch v. Bank of America National Trust & Savings Ass'n.*, 22 Cal.2d 316, 139 P.2d 1 (1943).

■ The second major allegation of error alleged by Mercantile relates to the question of the new trial granted on the issue of damages only. The new trial was ordered for the reason that a portion of MAI 4.01 as submitted to the jury was erroneously omitted. MAI 4.01 reads as follows, but the underlined portion was omitted:

> "If you find the issues in favor of the plaintiff, then you must award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe he sustained <u>as a direct result of the occurrence.</u>"

Since we have determined as a matter of law that the recovery against Mercantile on the 43 forged checks is precluded by § 400.-4–406, we need only consider the effect of the error in the instruction as to the altered checks. Under Rule 70.01(b), MAI 4.01 should have been given in its entirety to the exclusion of any other instruction. Under Rule 70.01(c), the instruction as given was erroneous, but its prejudicial effect is to be judicially determined. *Jefferson County Bank & Trust Co. v. Dennis*, 523 S.W.2d 165 (Mo.App.1975). We find that there was no prejudice in giving the incomplete instruction in this instance. The inelegantly altered checks totaled $1,438.29, and the jury verdict was in that exact amount; indeed, that is the only amount the jury could have returned for that was the face amount of the checks altered.[5] There was no room for

---

5. See also *State ex rel. State Highway Commission v. Beaty*, 505 S.W.2d 147, 154 (Mo. App.1974).

jury conjecture or speculation as to the damages on the alterations, and even Mercantile concedes that the damages on the altered checks involved only a mathematical computation by referring to the checks themselves. Therefore, a new trial on this point would be unavailing. *Collier v. Roth*, 515 S.W.2d 829 (Mo.App.1974); *La Plante v. E. L. DuPont DeNemours & Co.*, 346 S.W.2d 231, 244 (Mo.App.1961). In finding no prejudicial error in the instruction, we do not palliate or deviate from the application of the rule that MAI instructions should be precisely followed—only that here there was no prejudice to Mercantile by the omission. We abjure not the principles indited in *Brown v. St. Louis Public Service Co.*, 421 S.W.2d 255 (Mo. banc 1967), and *Offenbacker v. Sodowsky*, 499 S.W.2d 421 (Mo. 1973), but acknowledge that we are thereby bound.[6]

The judgment of the trial court in ordering a new trial as to damages only is reversed and the cause remanded with directions to enter judgment in favor of Nu-Way for $1,438.29 on the altered checks and in favor of Mercantile and against Nu-Way on the 43 forged checks.

SIMEONE, P. J., and McMILLIAN, J., concur.

---

**6.** *Brown v. St. Louis Public Service Company, supra*, and its progeny hold, of course, that "where there is deviation from an applicable MAI instruction which does not need modification under the facts in the particular case, prejudicial error will be presumed unless it is made perfectly clear by the proponent of the instruction that no prejudice could have resulted from such deviation." 421 S.W.2d at 259.