The HANOVER INSURANCE
COMPANIES

v.

BROTHERHOOD STATE BANK.

Civ. A. No. 78–2025.

United States District Court,
D. Kansas.

Dec. 7, 1979.

Bernard L. Balkin, Keith Witten and Lloyd S. Hellman, Sandler, Balkin, Hellman & Weinstein, Kansas City, Mo., C. Wayne Case, McDowell, Rice & Smith, Kansas City, Kan., for plaintiff.

Thomas L. Theis and Myron L. Listrom, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This action was tried to the court on September 24 and 25, 1979, the parties having waived a trial by jury. Hanover and Brotherhood have now filed suggested findings of fact, conclusions of law and post trial briefs. A November 7, 1979 letter from Hanover including a summary of deposition testimony has also been received. The letter is untimely and will not be considered, however, the depositions are in pertinent part already before the court.

■ As a preliminary matter, we must address Hanover's motion to strike defendant's exhibits A through D. These exhibits are checks with altered payees similar to the checks at the heart of this litigation that were received as plaintiff's exhibits 1 through 6. Exhibits A through D were drawn on and paid by the bank of plaintiff's expert witness. The plaintiff asks that the court strike exhibits A through D because they were not listed on the exhibit list exchanged with opposing counsel. Alternatively, the plaintiff asks that the disputed exhibits be received for the limited purpose of impeaching the credibility of the plaintiff's expert witness and not with regard to the issue of ordinary care or general banking usage. We agree that exhibits A through D are only admissible for the purpose of impeaching the expert's credibility. Accordingly, the plaintiff's alternative motion to limit consideration of exhibits A through D is granted.

After reviewing all of the evidence and the oral and written arguments of counsel, the court makes the following findings of fact and conclusions of law.

*Findings of Fact.*

At all times relevant to this litigation Sherrill Minter Ford, Incorporated, maintained checking account No. 04–172–6 with the Brotherhood State Bank. Sadie M. Geary was an employee of Sherrill Minter Ford. On six occasions Geary altered checks drawn on the account after they had been signed by authorized officers or employees of Sherrill Minter Ford. The employer permitted Geary on occasion to draft checks leaving the drawer's signature blank, make deposits, pick up cancelled checks and reconcile the checks with the account. However, Geary was not normally assigned to perform all these tasks and was not authorized to sign for the drawer. Geary's scheme involved the preparation of duplicate checks drawn on Sherrill Minter Ford's general account for purported payment of liens on trade-in automobiles. In fact these liens had already been paid. Geary crossed out the names of the original payees with her typewriter and typed in her own name. The dates, check numbers, amounts and total of the altered checks are as follows:

| Exhibit Number | Date | Check Number | Amount |
|---|---|---|---|
| 1 | 8–12–76 | 36949 | $ 2,330.63 |
| 2 | 8–19–76 | 36980 | 1,886.29 |
| 3 | 2– 4–77 | 38896 | 2,989.99 |
| 4 | 4– 6–77 | 39610 | 3,363.17 |
| 5 | 4–29–77 | 39805 | 3,540.26 |
| 6 | 6–28–77 | 40545 | 2,520.02 |
| | | | $16,630.36 |

Geary deposited each of the checks in whole or in part in bank accounts belonging to her. The checks were paid by Brotherhood from Sherrill Minter Ford's account. Check No. 36949, deposited at Brotherhood

on August 13, 1976, and Check No. 36980, deposited at Brotherhood on August 21, 1976, were split deposits (part deposited and part taken in cash). The other four altered checks were deposited at Security National Bank. Brotherhood paid these four checks as the drawee bank.

On the first business day of each month Brotherhood furnished Sherrill Minter Ford with bank statements and cancelled checks for the preceding month. The alterations were discovered by William L. Williams of Sherrill Minter Ford in late July or early August 1977. The alterations were reported to the defendant on or before August 18, 1977.

The depositions of Brotherhood State Bank cashier William Jacksettig, assistant cashier Roy. Collins, and supervisor of customer services Anna Mae Lundine disclose that Brotherhood did not examine checks to discover altered payees.

From the testimony of bank experts for plaintiff and defendant the court finds that area banks (1) are unlikely to spot payee alterations, (2) pay losses on small check alterations as a cost of doing business rather than examine the checks carefully for alterations, (3) consider it prudent to examine large checks more carefully than small checks, (4) investigate further if an alteration is spotted, and (5) rely on customers to report alterations.

*Discussion and Conclusions of Law.*

■ The plaintiff contends that it should recover the amount of the six checks less what Geary. has repaid because the checks were not properly payable under the Uniform Commercial Code as adopted by the State of Kansas at Chapter 84 of the Kansas Statutes. K.S.A. 84–4–401. Subsection 4–401(1) (Supp.1978) states:

"When bank may charge customer's account. (1) As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft."

Specifically, Hanover maintains that the checks were improperly paid because they were altered as defined by K.S.A. 84–3–407

and that the bank failed to exercise ordinary care in paying the items as required by K.S.A. 84–4–406. The term "properly payable" is defined in K.S.A. 84–4–104(i) to include "the availability of funds for payment at the time of decision to pay or dishonor." The definition does not exclude the plaintiff's contention that an altered item is not properly payable. Section 3–407(1) defines any alteration of an instrument as material that "changes the contract of any party thereto in any respect, including any such change in (a) the number or relations of the parties; or . . . (c) the writing as signed, by adding to it or by removing any part of it." Geary's substitution of her own name for that of the original payee is a material alteration. *Nu-Way Services, Inc. v. Mercantile Trust Company Nat'l Assoc.*, 530 S.W.2d 743 (Mo.App.1975); *In re Abercrombie Estate*, 20 Pa.D. & C.2d 496 (Allegheny County, Pa.1958).

■ Merely establishing that the checks contained material alterations is insufficient alone to impose liability upon the bank. The provisions of the code must be read together. The customer has a duty to discover alterations by promptly examining the bank statements and cancelled checks. K.S.A. 84–4–406. Prompt notice to the bank is also required. *Id.* If the bank proves that the customer has failed to comply with these duties and that the bank has also suffered a loss by reason of the customer's failure, then the customer is precluded under Section 4–406(2) from asserting the alterations. However, the subsection (2) preclusion is without effect if the customer establishes lack of ordinary care on the part of the bank in paying the items. The statute also establishes a one-year statute of limitations on alteration claims.

■ In applying the statute to the facts of the case, we find that the checks at issue were dated August 8 and August 19 of 1976 and February 4, April 6, April 29 and June 28 of 1977. Payment by the bank was made on or after these dates. Sherrill Minter Ford would have received the bank statement and cancelled checks on the first

business day of the month subsequent to the month when the payment was made. The first statement including an altered check would have been made available by the bank no earlier than September 1976. Sherrill Minter Ford had discovered and reported the altered checks by August of 1977. The one-year statute of limitations running from the date of the first statement reflecting the altered items does not bar these claims. Although not barred by the statute, the long delay could support a finding that Sherrill Minter Ford was negligent in examining its statements.

■■ Any lack of reasonable care and promptness in the conduct of Sherrill Minter Ford in examining its bank statements is of no weight under the statutory scheme if the bank is proven to have failed to use ordinary care in paying the items. *Taylor v. Equitable Trust Co.*, 269 Md. 149, 304 A.2d 838 (1973). The bank's lack of ordinary care may be demonstrated by proof that the bank's procedures were below the standard or that the bank's employees failed to exercise due care in processing the items. *First Nat'l Bank & Trust Co. v. Cutright*, 189 Neb. 805, 205 N.W.2d 542 (Neb.1973). The plaintiff's position is that the bank failed to use ordinary care when it paid the six checks without taking any precautions such as examining the checks for alterations and, if the alterations were discovered, contacting the drawer to determine whether Geary was the correct payee. According to Hanover the strikeover in and of itself should have put the bank on notice of a potential problem in paying the check. Furthermore, plaintiff maintains that the bank should be held liable because it has admitted using no procedures to detect altered payees. On the other hand, the bank contends that payment of commercial checks including strikeovers falls within the generally accepted banking practices in this geographical area. The bank goes even further and asserts that it has no duty under the UCC, or otherwise, to examine items for alterations of the payee. Rather, the bank would place the duty to discover the payee alterations on the customer.

■■ We conclude that the plaintiff has proven the bank's failure to use ordinary care in this instance. We find the bank's position that it has no duty to examine the check as to the named payee to be totally unacceptable. The bank has a duty to make payment only to the payees named in its depositors' checks or to their order. Consequently, the bank as a general rule has a duty to determine the identity of the payee. *American National Bank of Denver v. First National Bank of Denver*, 130 Colo. 557, 277 P.2d 951 (1954); *Federal Insurance Company v. Toiyabe Supply Co.*, 82 Nev. 14, 409 P.2d 623 (1966); *First National Bank of Nevada v. Dean Witter & Co.*, 84 Nev. 303, 440 P.2d 391 (1968); *Maynard Investment Co. v McCann*, 77 Wash.2d 616, 465 P.2d 657 (1970). There is simply no manner by which the bank can fulfill this duty of establishing that payment is made to the correct payee without examining the payee designated on the check. Brotherhood's contention that examining checks as to payees is not required by the UCC because the definition of "procedure of posting" at K.S.A. 84–4–109 does not include this step is unpersuasive. This nonexhaustive definition is included in the UCC for the purpose of setting a measuring point to determine when an item is finally paid. K.S.A. 84–4–109, Official UCC Comment. The definition does not establish minimum requirements for exercising ordinary care. Ordinary care in determining whether to pay checks to a named payee is certainly required by Section 4–406(3). Furthermore, the depositions of the bank employees disclose that the bank made no effort to detect alterations of payees. A bank's admission that it did not have time to accurately check signatures has been held to demonstrate a failure to use ordinary care. *Exchange Bank & Trust Co. v. Kidwell Construction Co.*, 463 S.W.2d 465 (Tex.Civ.App.1971) *aff'd* 472 S.W.2d 117 (Tex.1971). The alterations in exhibits 1 through 6 are conspicuous and maladroit. The discovery of such alterations does not require a sophisticated detection scheme. The substantial amounts of the checks involved in this case and the ease with which a telephone call could have confirmed the

payee are factors that further support the plaintiff's showing of a lack of ordinary care on the part of the bank. *See W. P. Harlin Construction Co. v. Continental Bank & Trust Co.*, 23 Utah 2d 422, 464 P.2d 585, 588 (Utah 1970).

■ The defendant introduced evidence to establish that checks are normally not examined as to payee in accordance with the standards of local banking usage. This is particularly true if the checks are for small amounts. We recognize that local banking practices may be useful in determining the standard of ordinary care required by § 4–406(3). *Coleman v. Brotherhood State Bank*, 3 Kan.App.2d 162, 166, 592 P.2d 103 (1979). In *Exchange Bank, supra*, 463 S.W.2d 465, 470–71, the court stated:

"It is the province of the trier of the fact to determine what constitutes ordinary care under a particular situation or combination of circumstances."

The Code states that "action or nonaction consistent with . . . a general banking usage not disapproved by this article, prima facie constitutes the exercise of ordinary care." The limited evidence introduced by the defendant is insufficient to support a finding that the bank is not liable because general banking usage permits either the practice of not examining checks as to payee or the practice of not considering checks drafted with strikeovers as altered instruments. Even if we assume that the bank established conformity with local standards, we would have to agree with the plaintiff that the bank is not automatically exonerated. As plaintiff stated in its brief, "no matter what minimal standards are suggested by local banking usage [such usage] cannot amend the statutory requirement of ordinary care . . . : 'Even an entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard.' " *Citing* W. Prosser, *Law of Torts* 167 (1971).

Apart from Section 4–406, Brotherhood asserts numerous defenses both within and without the UCC.

■ As one defense under the UCC, Brotherhood contends that the check was properly payable in accordance with Section 3–407(2). The subsection reads:

"(2) As against any person other than a subsequent holder in due course

(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;

(b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given."

Specifically, the bank maintains that the alteration does not discharge Sherrill Minter Ford for the reason that Geary, the person who altered the checks, was not a holder as required by Section 3–407(2)(a). We agree that Geary is not a holder as defined in K.S.A. 84–1–201(20). However, this is of little import as the question of the discharge of the drawer of the check is not before us. Official Code Comment 3(c) of K.S.A. 84–3–407 states, "The discharge is a personal defense of the party whose contract is changed by the alteration, and anyone whose contract is not affected cannot assert it." The issue of discharge is not asserted by either party to the check. Furthermore, discharge is irrelevant to our determination of whether the check is properly payable. The drawer of the check need not be discharged for the altered check to be considered improperly paid by the bank.

■ The defendant next contends that it is not liable because the checks were originally drawn as the result of conduct by an unfaithful Sherrill Minter Ford employee who intended that the payee have no interest in the checks. The fictitious payee—unfaithful employee situation is covered by the UCC at K.S.A. 84–3–405(1)(c) as follows:

"(1) An indorsement by any person in the name of a named payee is effective if . . . .

"(c) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest."

Defendant admits that the provision is not applicable by its express terms because the unfaithful employee, after obtaining the drawer's signature, substituted her own name for that of the named payee and then endorsed the check accordingly. Nonetheless the bank urges the court to discount the statutory requirement of endorsement in the name of the named payee because the policy considerations of Section 3–405 apply to the facts at hand. The code comments state that in a fictitious payee situation the loss "should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee." A fictitious payee check, however, does not become bearer paper and a purportedly regular chain of endorsements is required. Since the fraud is usually initiated by a person who intends to obtain the proceeds of the check it is likely that the wrongdoer will have used an identity that he or she can readily assume. The chain of endorsements in such a case would appear to be proper and the drawee bank would have little opportunity to discover the fraud. In further support of drawer liability on these facts the bank relies on *Perini Corporation v. First National Bank of Habersham County, Ga.*, 553 F.2d 398 (5th Cir. 1977). *Perini* is a double forgery situation. In a double forgery the wrongdoer is also likely to draw the check to a payee whose identity he can readily assume at the time of endorsement. The Fifth Circuit stated: "In such circumstances the party who first takes the check may well have no particular opportunity to detect any impropriety in the endorsement."

In the case before us we have the one critical additional circumstance that the dishonest employee struck out the original payee's name and substituted her own. She then was precisely who she represented herself to be when she endorsed the checks. *See W. R. Grimshaw Co. v. First National Bank & Trust Co.*, 563 P.2d 117, 122 (Okl. 1977). We find that such a blatant alteration substantially changes the bank's position. The relatively blameless conduct of a payor bank in a Section 3–405(1)(c) fictitious payee situation and in a *Perini* double forgery situation is replaced by the negligent conduct of a bank that pays a check without exercising ordinary care. An almost identical set of facts was addressed in *Nu-Way, supra*. Therein, the dishonest employee altered some signed checks as to payee by erasing the original payee's name and substituting his own. The erasure was obvious. The employee had also forged the drawer's signature on other checks. The court held that the bank's signature checking procedures were sufficient as to the forged checks, but that the altered checks were not detected only because the bank failed to exercise ordinary care. A similar situation resulted in the bank's liability in *Wright v. Bank of California*, 276 Cal. App.2d 485, 81 Cal.Rptr. 11 (1969). Therein the bank was negligent in paying a check that otherwise fell within the imposter rule because there was no endorsement at all. In *Jackson v. First National Bank, Inc.*, 55 Tenn.App. 545, 403 S.W.2d 109 (1966) the court found the bank negligent in paying checks when it failed to check its signature card, failed to inquire as to a church financial secretary's authority to dispose of trust funds and failed to inquire when checks were presented that were made payable to the secretary personally but bore the endorsement of a dog racing corporation. *See also Twellman v. Lindell Trust Co.*, 534 S.W.2d 83 (Mo.App.1976). Cases cited by the bank do not require a different result.

It has been stated that "[t]he general theory of the UCC is to allow the loss to fall, as among the innocent parties involved, on that person who was closest to the indi-

vidual causing the loss and presumably the person who had the best opportunity to avoid the loss." *Grimshaw, supra* at 121. We believe the general theory is best advanced by not expanding Section 3–405 to cover these facts. The section is not applicable on its face and the negligence of the bank in paying patently altered items precludes extending the statute's application for reasons of policy. *Perini* is likewise distinguishable due to the negligent conduct of the bank.

▪ As an additional defense, Brotherhood maintains that the negligence of Sherrill Minter Ford substantially contributed to the material alteration of the checks in question; namely, Sherrill Minter Ford failed to adequately supervise the employee Geary. Such contributory negligence is alleged to preclude the plaintiff from asserting the alteration against the bank under K.S.A. 84–3–406. The plaintiff points out that the contributory negligence preclusion operates only if the bank pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business. The Official Comments to the UCC indicate that it is the drawer's substantial negligence in the drafting of the check that triggers the preclusion. Although negligence is not defined, the Comments note that negligence has been found "where spaces are left in the body of the instrument in which words or figures may be inserted." Comment 4 stresses that the negligence must afford an opportunity of which advantage is taken. It reads in pertinent part:

> "The section approves decisions which have refused to hold the drawer responsible where he has left spaces in a check but the payee erased all the writing with chemicals and wrote in an entirely new check."

On the facts before us, no negligence is alleged to have occurred in the manner that Sherrill Minter Ford filled in the required information on the check. We do not find that the employer's negligence in supervising its employee substantially contributed to the alteration of the check in the sense

required by Section 3–406. *See Jackson, supra.* Even if we were to find substantial contributory negligence, our previous findings as to the bank's conduct remove Brotherhood from the status of one who paid the instrument "in good faith and in accordance with the reasonable commercial standards of the drawer's or payor's business." *See Gresham State Bank v. O and K Construction Co.,* 231 Or. 106, 370 P.2d 726, *clarified on other points and rehearing denied* 231 Or. 106, 372 P.2d 187 (1962); *Board of Higher Education v. Bankers Trust Co.,* 86 Misc.2d 560, 383 N.Y.S.2d 508 (1976). Section 3–406 does not preclude recovery by the plaintiff.

▪ Brotherhood next contends that K.S.A. 84–3–419(3) limits its liability in conversion or otherwise "beyond the amount of any proceeds remaining in [its] hands." Assuming without finding that the provision applies, we find the bank failed to make payment in accordance with the reasonable commercial standards applicable to the business. The statute provides no defense to the bank on the facts before us.

▪ The bank also relies on K.S.A. 84–4–401(2) as its authority for charging the Sherrill Minter Ford account. The subsection reads:

> "(2) A bank which in good faith makes payment to a holder may charge the indicated account of its customer according to
>
> (a) the original tenor of the altered item; or
>
> (b) the tenor of the completed item, even though the bank knows the item has been completed unless the bank has notice that the completion was improper." K.S.A. 84–4–401(2) (Supp.1978).

As the bank itself has pointed out, Geary does not meet the definition of a holder under UCC § 1–201(20) because the item was not drawn, issued, or endorsed to her. Furthermore, the bank's contention that "original tenor of the altered item" refers only to the amount of the item is without support. The bank has no defense here.

■ The bank urges the court to look to the policy provisions of the UCC stating the code's underlying purposes as simplifying, clarifying and modernizing the law governing commercial transactions and permitting the continual expansion of commercial practices through custom, usage and agreement of the parties. Brotherhood contends that the demands of modern banking justify an interpretation of the banks' and customers' duties under the code that would place the full responsibility of detecting payee alterations upon the customer. We believe the bank asks too much of the court. Mere technological innovations, an increased workload and a desire to save time, money and effort do not relieve the bank of its responsibility to exercise ordinary care. Any shifting of this responsibility to the customer must be accomplished by legislative action and not by a ruling of the court.

■ The bank next contends that Hanover has not demonstrated an equity superior to that of the defendant and is thus barred from recovery by the compensated surety defense. In essence the compensated surety defense or the doctrine of superior equities requires that the equities of the surety and of the third party be weighed. Recovery is permitted only when no injustice would be done to the other party by allowance of subrogation. The defendant contends that Kansas adopted the doctrine in *Western Surety Company v. Loy*, 3 Kan. App.2d 310, 313, 594 P.2d 257 (1979). *Western* reversed the trial court's summary judgment for the defendant because genuine issues of material fact remained. The court indicated that the doctrine of superior equities would be applicable when the case was reached on the merits by the trial court. The doctrine is also mentioned, although found inapplicable, in *Kansas City Title & Trust Co. v. Fourth National Bank*, 135 Kan. 414, 10 P.2d 896 (1932).

Assuming that the doctrine has been adopted into Kansas law, we do not find that it works to bar recovery by the plaintiff here. Principles of law and equity continue to supplement the provisions of the UCC unless displaced by the particular provisions of the act. K.S.A. 84–1–103. The rights of the surety are affected by the code to the extent that the rights of the insured are affected. The provisions of the UCC at § 3–406 and § 4–406 operate as at least a partial codification of the principles at work in the compensated surety defense. We have previously determined that these statutes do not bar recovery by the plaintiff. Likewise the doctrine of superior equities does not protect the bank here.

In assessing the equities, the defendant contends that Sherrill Minter Ford failed in its duty to exercise reasonable care in two ways; (1) a failure to supervise Geary, permitting her to draw checks, make deposits, pick up bank statements and reconcile the accounts, and (2) a failure to promptly and reasonably examine its bank statements and cancelled checks and to notify the bank of any alterations it might discover. These failures are imputed to the surety. The bank relies upon *Continental Insurance Company v. Morgan, Olmstead, Kennedy and Gardner, Inc.*, 83 Cal.App.3d 593, 148 Cal.Rptr. 57 (1978) to support its theory of a compensated surety defense. *Continental* deals with a completely different factual situation involving treasury bonds payable to bearer. In its analysis the court stated 148 Cal.Rptr. at 63: "In the case of the check forged by a bonded employee, the primary cause of the loss is the conduct of the dishonest employee. The action of the bank in paying the check is secondary." Counterbalancing the plaintiff's negligence in our comparison of the equities here is the bank's negligence in failing to meet its duty of ordinary care in paying the checks. Significantly, the statement quoted above in *Continental* is qualified by the following: "*Absent some negligent conduct of a character which promotes or encourages the employee's fraud*, the bank is not in a better position to avoid the loss than is the insured's employer." (Emphasis added.) Our analysis under the UCC has led us to conclude that the bank's negligence was the primary cause of the loss and that the bank was in a better position to avoid the loss than was Sherrill Minter Ford. Plaintiff has demonstrated its superior equity.

■ Another of the bank's defenses is based upon the equitable maxim "that as between two innocent persons, one of whom must suffer the consequence of a breach of trust, the one who made it possible by his act of confidence must bear the loss." 27 Am.Jur.2d *Equity* § 147. The Kansas cases relied upon by the defendant state the principle more broadly; namely, "where one of two innocent persons must suffer by reason of the fraud or misconduct of a third, he by whose act, omission, or negligence, such third party was enabled to consummate the fraud, ought to bear the loss." *Wichita Savings Bank v. Atchison, Topeka & Santa Fe Railroad Company*, 20 Kan. 519, 526 (1878); *Kohn v. Watkins*, 26 Kan. 691, 701 (1882); *Sawyer v. Symns*, 39 Kan. 148, 17 P. 799 (1888); *Rose v. Douglass Township*, 52 Kan. 451, 34 P. 1046 (1893); *Chicago G. W. Railroad Co. v. Lowry*, 119 Kan. 336, 239 P. 758 (1925). We have previously noted that this principle is a fundamental theory upon which the UCC rests. On these particular facts the application of this principle and the UCC requires that we find the bank liable for its negligence. Although the bank and the employer are innocent as to the specific fraud perpetrated by Geary, neither is totally without fault in permitting the fraud to be temporarily successful. We have already held that the bank's negligence was the proximate cause for the loss. The alleged breach of trust does not nullify the bank's negligence.

In summary, we hold that the plaintiff has proven its case against the bank for paying an altered check without meeting its duty of ordinary care under the UCC. The bank has not successfully established any defense either within or without the UCC. We again caution that the conspicuous nature of the payee alterations and the bank's admission through its employees that it had no procedure for examining checks as to payees were primary factors in our determination of liability.

We do not intimate by our decision that the bank has no choice but to hire additional employees to examine checks. The bank's position as a business is appreciated. According to the testimony of the banking experts the banks currently forego detailed examinations of checks for small amounts. The reason given for this policy is that in the best business judgment of the banks it is more efficient and economical to absorb the loss on those few bad checks as a cost of doing business. Such a policy is well recognized in business and in law. The consequences of the policy are no less than that the bank must make its customers whole when an improper payment is made against the customer's account.

Accordingly, Brotherhood State Bank is liable to the plaintiff for the amount of the six checks less the amount that has been repaid by Geary. Counsel for plaintiff is directed to prepare, circulate and submit for the court's approval a Journal Entry of Judgment reflecting the foregoing Memorandum and Order.