WILDER BINDING COMPANY, Plaintiff-Appellee, v. OAK PARK TRUST AND SAVINGS BANK, Defendant-Appellant.

First District (4th Division)   No. 87—1808

Opinion filed June 16, 1988.—Rehearing denied August 16, 1988.

JIGANTI, P.J., dissenting.

Spitzer, Addis, Susman & Krull, of Chicago (Michael B. Susman, Robert J. Krull, and Jonathan L. Loew, of counsel), for appellant.

Gottlieb & Schwartz, of Chicago (Loren J. Mallon and March R. Jacobs, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Wilder Binding Company, brought this action to recover $19,630 that Oak Park Trust & Savings Bank paid out of Wilder's account on checks that were forged by Wilder's bookkeeper during an eight-month period. Wilder also sought an award of prejudgment interest. Following a hearing on Wilder's motion for summary judgment, the trial court entered judgment for the principal balance against Oak Park but denied Wilder's request for interest.

Oak Park appeals, contending that there are fact issues precluding summary judgment, including the relative standards of care that depositors and banks owe for the prevention and discovery of check forgeries, as set out in the Uniform Commercial Code, particularly section 4—406 (Ill. Rev. Stat. 1985, ch. 26, par. 4—406).

Wilder cross-appeals from the order denying its request for prejudgment interest.

We affirm the trial court.

BACKGROUND

From December 20, 1983, through July 15, 1984, Oak Park debited Wilder's account for a total of $25,254.78 in checks that had been forged by Wilder's bookkeeper, Lorine Daniels. On file at the bank were signature cards for Donald McCarrell and Douglas McCarrell only. Daniels made the checks payable to her and forged McCarrell's signature. The checks, all in amounts under $1,000, were cashed through the use of Oak Park's automatic check-sorting device. This machine separates checks in amounts less than $1,000 and pays them automatically. Use of this device is a business practice, presumably shared by many or most banks in Chicago, and was developed to allow banks to quickly process large daily volumes of checks.

Wilder was unaware that Daniels, a convicted felon, was forging checks until its accountant discovered them during an inspection of Wilder's records on July 15, 1984.

Within a few days, Wilder informed the bank of the forgeries and unauthorized payments from its account. Wilder demanded the return of the full $25,254.78, but the bank credited only $5,624.78 to Wilder. This sum represented the total of forged checks that had been paid out in the month immediately preceding Wilder's report of the forgeries to Oak Park Trust and Savings Bank (June 1984).

The bank admitted that no checks under the amount of $1,000 were reviewed by sight or other method that would reveal the possibility of an unauthorized or forged signature. Instead, the bank used a check-sorting machine, which was programmed to pay, automatically, those drafts in the amount of $1,000 or less. According to an affidavit of Robert C. Visconti, a bank official with many years of experience, it is common practice in Chicago for banks the size of Oak Park to use such automatic check sorters.

Wilder received eight monthly bank statements during the period of the unauthorized payments. These statements included the cancelled checks that had been forged by Daniels.

After a hearing, the trial court granted Wilder's motion for summary judgment in the amount of $19,630, the balance calculated to be owing after crediting the bank with its initial payment. The court denied Wilder's request for prejudgment interest, however.

OPINION

I

This court is asked to resolve an apparent conflict in the interpretation of certain provisions of the Uniform Commercial Code, as

adopted by Illinois (UCC) (Ill. Rev. Stat. 1985, ch. 26, par. 1—101 *et seq.*). Specifically, the bank argues that under sections 3—406[1] and 4—406[2], its duty was simply to detect the forgeries during the one-month period before Wilder received the statement and cancelled checks, plus 14 days. After that, Wilder had a duty to inspect the cancelled checks and discover the forgeries (thus preventing further losses). Wilder's failure to do so establishes its negligent contribution to its own loss, which is a defense to the bank's liability. At that point, the burden of proof switches to Wilder, to prove that the bank's commercial practices do not conform to commercial reasonableness and the community standard, a factual issue. Hence, it was improper to enter summary judgment in favor of Wilder.

Wilder, on the other hand, relies on several cases from other jurisdictions that have interpreted the relevant provisions favorably to the depositor when a bank fails to take reasonable measures to inspect drafts for signatures before paying them.

■ Section 3—404(1) of the UCC provides that "[a]ny unauthor-

---

[1]Section 3—406 provides as follows: "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." Ill. Rev. Stat. 1985, ch. 26, par. 3—406.

[2]In pertinent part, section 4—406 provides:

"(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)." Ill. Rev. Stat. 1985, ch. 26, par. 4—406.

ized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it." Under section 4—401, the bank may charge against a customer's account only those items which are "properly payable." A forgery is obviously an unauthorized signature that is not properly payable by the bank in the first instance. If, however, the depositor is negligent in examining its bank statement and promptly reporting any unauthorized debits to the bank, under section 4—406 the customer is precluded from asserting the unauthorized payment, *unless* "the customer establishes lack of ordinary care on the part of the bank in paying the item(s)."

Wilder relies on several cases that have interpreted the relevant code sections in a manner favorable to its position. Chief among these decisions is *Medford Irrigation District v. Western Bank* (1984), 66 Or. App. 589, 676 P.2d 329. In *Medford*, the court affirmed summary judgment in favor of a depositor whose bookkeeper had forged checks in amounts under $5,000, which the bank automatically paid through its computerized check-cashing system. As in the pending case, the bank did not review each check that was below the threshold amount but simply paid them as a matter of course. The *Medford* court noted, for purposes of the summary judgment motion, that the customer was negligent for not supervising its bookkeeper or reviewing its bank statements. In analyzing the bank's duty to its customers under the UCC, however, the court held that whatever procedure the bank used to process checks and review signatures must "reasonably relate to the detection of unauthorized signatures in order to be considered an exercise of ordinary care or reasonable commercial banking standards." (66 Or. App. at 592-93, 676 P.2d at 332.) Accordingly, the court rejected the bank's attempt to assert the plaintiff's negligence as a defense pursuant to Oregon's counterpart of section 4—406. The court concluded that the bank was liable for paying the depositor the face amount of forged checks and that there was no issue of fact as to its liability.

Similarly, in *Maddox v. First Westroads Bank* (1977), 199 Neb. 81, 256 N.W.2d 647, the Nebraska Supreme Court held that a bank could not charge its customer for forged savings account withdrawal slips, applying the same rationale as applicable to forged checks. The court felt it to be "elementary that a bank is held bound to know the genuine signature of its customers." 199 Neb. at 87, 256 N.W.2d at 652. Accord *W. P. Harlin Construction Co. v. Continental Bank & Trust Co.* (1970), 23 Utah 2d 422, 464 P.2d 585; see also *American Machine Tool Distributors Association v. National Permanent Fed-*

*eral Savings & Loan Association* (D.C. 1983), 464 A.2d 907; *Perley v. Glastonbury Bank & Trust Co.* (1976), 170 Conn. 691, 368 A.2d 149.

These cases support the entry of summary judgment in favor of Wilder. The bank, however, argues that the decisions are undercut by the more recent Tennessee case of *Vending Chattanooga, Inc. v. America National Bank & Trust Co.* (Tenn. 1987), 730 S.W.2d 624, which held that the depositor's negligence in failing to discover and report the forgeries was a proximate cause of the bank's payment of the forged checks. The court analyzed the relevant UCC sections and concluded that the case before it required a remand to determine whether the bank's conduct comported with reasonable commercial standards of banking industry so as to bring it within the "ordinary care" requirement of section 4—103(3).

*Vending Chattanooga's* basic analysis does not differ substantially from that of *Medford*. Both cases recognize the bank's absolute duty, in the first instance, to pay only authorized drafts and the depositor's duty to timely inspect his statements. Both further acknowledge that the depositor's negligence may preclude his recovery of forged items after he has had the opportunity to review the statements, but that his negligence will be cancelled out if the bank failed to exercise "ordinary care" in paying the items. However, *Medford* holds that the bank's failure to adopt any reasonable safeguard to detect forgeries (below the $5,000 cut-off amount) lacks ordinary care as a matter of law. *Vending Chattanooga* treats the ordinary care issue in the case before it as a question of fact. (This case involved the forgery of out-of-sequence checks and did not address the automatic payment of checks through a computerized sorter.)[3]

■ The facts of the pending case fit squarely within the *Medford* court's rationale. In both cases, the ordinary care question was limited to whether or not the use of an automatic check-sorting machine, which completely ignores the customer's signature as a criterion for accepting drafts, demonstrates a lack of ordinary care as a

---

[3]*Vending Chattanooga* puts the burden of proving the bank's lack of ordinary care on the depositor, once the bank has proved the customer's failure to timely examine and report forgeries under section 4—406. 730 S.W.2d at 629. *Cf. American Machine Tool Distributors Association v. National Permanent Federal Savings & Loan Association* (1983), 464 A.2d 907, 912 ("the question of [the employer's] negligence in permitting [an employee's] forgeries to go undiscovered is legally irrelevant until [the bank] establishes that it acted according to the reasonable commercial standards of its business when it paid the checks over those unauthorized endorsements"), construing UCC section 3—406.

matter of law.

We believe that it does. Since the bank has an absolute duty not to pay unauthorized drafts, such payment, even in good faith, violates the duty to pay only those items which are "properly payable." (Ill. Rev. Stat. 1985, ch. 26, par. 4—401.) Another way of stating this obligation is the requirement of knowing the genuineness of the depositor's signature. (Ill. Rev. Stat. 1985, ch. 26, par. 3—401; *Vending Chattanooga, Inc. v. America National Bank & Trust Co.* (Tenn. 1987), 730 S.W.2d 624.) As the *Medford* court recognized, "because [the bank] failed to exercise ordinary care or to follow reasonable commercial banking practices, it is foreclosed from asserting plaintiff's negligence and is liable for paying the face amount of the forged checks. There is no issue of fact as to [the bank's] liability or the amount." *Medford*, 66 Or. App. at 596-97, 676 P.2d at 334.

■ Negligence, as such, does not enter into this aspect of the analysis unless the customer's negligence has helped cause the forgery in the first place. Then section 3—406 applies, and the bank may have a defense even though it paid the forgeries. (See *Maddox v. First Westroads Bank* (1977), 199 Neb. 81, 92-93, 256 N.W.2d 647, 654-55.) Under section 4—406, however, the depositor has a distinct duty; that of reviewing his or her bank statements and cancelled checks in a timely manner and reporting any unauthorized payments to the bank. The depositor loses his claim against the bank if the bank establishes that the depositor breached his duty to timely examine his statements. Even if the bank establishes this, however, *the depositor must prevail if he demonstrates that the bank paid the unauthorized items without exercising reasonable care.* Depending on the circumstances, the question of ordinary care may be a question of fact or law.

■ On this record we cannot say that the bank has raised a disputed issue of material fact. We agree with the *Medford* line of cases that a bank's failure to adopt any method reasonably related to detecting improper signatures on checks under a set amount lacks ordinary care. That all banks may use similar automatic check-cashing procedures is immaterial if the procedure itself fails to comport with the bank's statutory duties to the customer. Therefore, we reject the notion that the words "general banking usage" magically insulate banks from the duty of ordinary care. See *Perley v. Glastonbury Bank & Trust Co.* (1976), 170 Conn. 691, 703, 368 A.2d 149, 155 (certain procedures "may well be common among banks, but the defendants failed to show that such conduct is reasonable. An examination of signature cards to determine the genuineness of endorse-

ments may not be entirely practical under modern banking methods, but we do not feel that that necessarily relieves banks of the risk of loss from payment on forged checks").

The result is neither unforeseen nor unfair. As a cost of doing business, banks have a choice of examining each draft against the signature, using some form of random check or using automatic sorters and absorbing the expense of the occasional forgeries that pass through their systems. The defendant bank in *Medford* had done just that, determining that the cost of checking each draft individually would be prohibitive and result in few discoveries of forged items. Accordingly, it adopted a less costly procedure that would result in possible loss through undetected forgeries but would ultimately save money. One of the defendant banks in *Perley v. Glastonbury Bank & Trust Co.* (1976), 170 Conn. 691, 368 A.2d 149, had determined that it would not only not inspect each check under a certain amount, but it would pass along to the customer the cost of any forged items that got through, presumably relying on the customer's failure to detect the forgeries as a defense under sections 3—406 and 4—406. This is improper and distorts the intent of the UCC.

■ We conclude that the applicable provisions of the UCC strike a balance between the respective rights and obligations of banks and their depositors. Since the bank has a strict duty to pay only authorized drafts from a customer's account, the customer's negligence in failing to detect the forgeries within a certain time period may be a proper defense, but not if the bank's forgery-detection procedures are nonexistent, as they were in this case. Therefore, we affirm the trial court's ruling.

## II

Wilder has cross-appealed from the trial court's denial of its request for prejudgment interest on its award. In support it relies on two provisions of section 2 of the Interest Act (Ill. Rev. Stat. 1985, ch. 17, par. 6402), which allows creditors to receive 5% simple interest "for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing ***; and on money withheld by an unreasonable and vexatious delay of payments."

As Wilder's first asserted basis for recovery of prejudgment interest, it seeks to recover on an "instrument of writing" for an amount that is fixed, or easily ascertainable (as distinguished from unliquidated amounts).

■ We disagree that application of this provision to these facts is appropriate. The type of instrument contemplated is a genuine

bond, note, bill, or other writing that evidences money lent or advanced, thus setting up a creditor-debtor relationship. (See *Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 342 N.E.2d 758; *Haas v. Cravatta* (1979), 71 Ill. App. 3d 325, 389 N.E.2d 226.) A forged check is not an instrument of indebtedness under this rationale. Moreover, the first clause of section 2 has been construed to require that the written instruments referred to must bear a specific date by which the indebtedness created comes due. (*Reserve Insurance Co. v. General Insurance Co. of America* (1979), 77 Ill. App. 3d 272, 395 N.E.2d 933.) Since Wilder's claim does not come within the scope of this clause, we find no error in the court's refusal to award prejudgment interest thereunder.

■ Nor do we find persuasive Wilder's second basis for supporting an interest award: that the bank's failure to pay was unreasonable and vexatious. This clause of section 2 was not designed to reach *bona fide* disputes over claims. We have noted that " '[t]o appear and defend a suit is a right which cannot be construed into unreasonable and vexatious delay of payment without impairing the right itself.' Where therefore the delay in payment is the result of litigation, the petitioner must establish contrivance on the part of the litigant which approximates actual fraud." (*Kespohl v. Northern Trust Co.* (1970), 131 Ill. App. 2d 188, 191, 266 N.E.2d 371, 374, quoting *Aldrich v. Dunham* (1885), 16 Ill. 403, 404.) We find no such evidence in the record.

For the foregoing reasons, we affirm the rulings of the trial court on both the main appeal and cross-appeal.

Affirmed.

JOHNSON, J., concurs.

PRESIDING JUSTICE JIGANTI, dissenting:

I disagree with the conclusion of the majority that a bank fails to use "ordinary care" under section 4—406(3) of the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 4—406(3)), as a matter of law, when it automatically pays checks under $1,000 without verifying the signatures. I believe that a determination of whether the bank acted with ordinary care is a question of fact.

The majority's holding rests on the premise that a bank has a statutory duty to pay only those items with authorized signatures. Because of this duty, the majority reasons, a bank does not exercise ordinary care when it uses a procedure which will never detect a

forged signature on a check under a certain amount. This rationale is consistent with the decision in *Medford Irrigation District v. Western Bank* (1984), 66 Or. App. 589, 676 P.2d 329, upon which the majority relies. However, the majority, like the court in *Medford*, fails to address the real issue: what is meant by ordinary care as it applies to section 4—406(3).

Article 4 of the UCC, which governs the liability arising from the processing of checks, imposes on all banks an obligation to use good faith and ordinary care. (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 440 (Smith-Hurd 1963).) There is no specific definition of ordinary care in section 4—406(3) and "[n]o attempt is made in [Article 4] to define in toto what constitutes ordinary care or lack of it." (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 440 (Smith-Hurd 1963).) The failure to give a specific definition reflects the intention of the drafters of the Code to provide for flexibility in determining what constitutes ordinary care as well as a recognition that express provisions might prove obsolete. See Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 437, 441 (Smith-Hurd 1963).

However, section 4—103(3) of the UCC, which was virtually ignored by the majority, does give some guidance as to certain standards of ordinary care. (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 437 (Smith-Hurd 1963).) Section 4—103(3) states in relevant part that "action or non-action consistent with *** general banking usage *** prima facie constitutes the exercise of ordinary care." (Ill. Rev. Stat. 1985, ch. 26, par. 4—103(3).) The term "general banking usage" is not specifically defined in the UCC. However, comment 4 to section 4—103(3) of the UCC states that the term "should be taken to mean a general usage common to banks in the area concerned. *** A usage followed generally throughout a state, a substantial portion of a state, a metropolitan area or the like would certainly be sufficient." Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 441 (Smith-Hurd 1963).

Thus, a bank exercises ordinary care when it pays a check in good faith and in accordance with "the reasonable commercial standards of the banking industry." (*Vending Chattanooga, Inc. v. American National Bank & Trust Co.* (Tenn. 1987), 730 S.W.2d 624, 628.) Application of this rule would depend on the facts in each case and what the facts show to be a reasonable commercial standard of the banking industry. (*Chattanooga*, 730 S.W.2d at 628.) The question of whether a bank exercised ordinary care has routinely been held to

present a triable issue of fact for the jury to decide. *Five Towns College v. Citibank, N.A.* (1985), 108 A.D.2d 420, 429, 489 N.Y.S.2d 338, 344; see also 7 R. Anderson, Uniform Commercial Code §4—406:12 (3d ed. 1985).

Not only is the majority's strict liability approach inconsistent with the concept of flexibility which the drafters provided for in article 4, but such an approach ignores the impact that computers have in handling tremendous volumes of checks. Rules governing check processing should take into account the necessity · of processing a large volume of checks efficiently and at a low cost and should not be so restrictive that they hinder the free flow of the almost unanimous number of good checks. (Note, *Computerized Check Processing & a Bank's Duty to Use Ordinary Care,* 65 Tex. L. Rev. 1173, 1199 n.183 (1987), citing Leary, *Check Handling Under Article 4 of the Uniform Commercial Code,* 49 Marq. L. Rev. 331, 334 (1965).) Because the standard of ordinary care applies in the tort sense (see Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 440 (Smith-Hurd 1963)), consideration of the savings and efficiency provided by computerized check processing is appropriate. Note, *Computerized Check Processing & a Bank's Duty to Use Ordinary Care,* 65 Tex. L. Rev. 1173, 1198 (1987).

The majority fears that the term "general banking usage" magically insulates banks from the duty of ordinary care. Keeping in mind the position taken by the majority which confines its focus to the bank's duty to pay checks with authorized signatures, without taking into consideration the utility of a procedure which allows banks to process a large volume of checks or the allocation of responsibility between customer and bank provided for in section 4—406, such a reaction is not surprising. Although I recognize that banks cannot be allowed to set their own uncontrolled standard as to what constitutes ordinary care, there is nothing magical about allowing the trier of fact to determine whether the method employed by a bank is inconsistent with local standards or is so careless as to show a lack of ordinary care on all banks.