Jerry & Peggy McDOWELL, Appellant,

v.

DALLAS TEACHERS CREDIT
UNION, Appellee.

No. 05-88-00652-CV.

Court of Appeals of Texas,
Dallas.

April 28, 1989.

Rehearing Denied June 14, 1989.

John D. Exline, Lawrence W. Bailey, Dallas, for appellant.

Stephen L. Baskind, Dallas, for appellee.

Before HOWELL, LAGARDE and WHITTINGTON, JJ.

LaGARDE, Justice.

Appellants, Jerry and Peggy McDowell, appeal from a take nothing judgment in favor of appellee, Dallas Teacher's Credit Union (D.T.C.U.). We hold that, under the admitted facts of this record, D.T.C.U. is liable to the McDowells for amounts paid on forged share drafts.[1] We reverse and render.

In the trial below, the McDowells alleged that D.T.C.U. breached its duties under the Texas Business and Commerce Code by paying forged share drafts, charging the share drafts against the McDowells' account, and then refusing to reimburse the McDowells for those payments. In six points of error, the McDowells assert that the trial court erred in: (1) denying their Motion for Judgment Notwithstanding the Verdict (J.N.O.V.) and denying their Motion to Disregard the Answer to Jury Question number three because there was no evidence that D.T.C.U. made available to the McDowells, in a reasonable manner, the share drafts charged against their account; (2) denying the McDowells' Motion for New Trial since there was insufficient evidence to support the jury's answer to jury question number three in which the jury found that D.T.C.U. made available to the McDowells, in a reasonable manner, the share drafts charged against their account; (3) denying the McDowells' Motion for J.N. O.V., denying the McDowells' Motion to Disregard the Jury's Answer to Question number four, and granting judgment for D.T.C.U. because the evidence established, as a matter of law, that D.T.C.U. failed to use ordinary care in its treatment of the forged share drafts; (4) denying the McDowells' Motion for New Trial because the jury's answer to jury question number four that D.T.C.U. did not fail to exercise ordinary care in its treatment of the forged share drafts was against the great weight and preponderance of the evidence; (5) denying the McDowells' Motion for J.N.O.V.,

denying the McDowells' Motion to Disregard the Jury's Answer to Jury Question number five, and granting judgment for D.T.C.U. because there was no evidence that D.T.C.U. acted in accordance with reasonable commercial standards in cashing the forged share drafts; and (6) denying the McDowells' Motion for New Trial because there was insufficient evidence to support the jury's answer to jury question number five stating that D.T.C.U. acted in accordance with reasonable commerical standards in cashing the forged share drafts. We agree with points of error three and five; consequently, we reverse the trial court's judgment and render judgment for the McDowells in the amount of $51,937.75 and award reasonable attorney fees of $26,700 for the trial below, $15,000 for appeal to this Court, and $10,000 if appealed to the Texas Supreme Court.

At the outset of our discussion, we note that the parties have not cited and we have not found any occasion when a Texas court has ruled on the particular issues presented in this case. This case, therefore, presents a question of first impression under Texas law.

### Facts

The McDowells had several accounts at D.T.C.U. They used one of these accounts, called a share draft account, for their fund raising business. This share draft account was set up to function in a manner similar to a bank's checking account.

At the time that the McDowells established the account, the share draft agreement stated, in pertinent part:

I/We, hereinafter called "Undersigned" whether one or more, do hereby authorize the DALLAS TEACHERS CREDIT UNION, hereinafter called "Credit Union" to establish a special share account for the Undersigned to be known as a "ShareDraft Account". The Credit Un-

---

1. Share drafts function exactly like checks. For the purposes of this opinion and Chapters 3 and 4 of the Texas Business and Commerce Code, we conclude that there is no appreciable difference between bank checks and credit union share drafts. *See In re Bohlen Enterprises,* 859 F.2d 561, 562 n. 1 (8th Cir.1973); TEX.REV.CIV. STAT.ANN. art. 2461–12.02(b) (Vernon Supp. 1989) (unless provided by written agreement Chapters 3 and 4 of the Texas Business and Commerce Code apply to credit unions).

ion is authorized to pay drafts signed by me or by any of us, if this Agreement is signed by more than one person, and to charge the payments against this Share-Draft Account.

The agreement then went on to state:

The Credit Union shall be authorized to pay a draft presented for payment even though the signature or signatures thereon do not correspond exactly with that set forth below.

Although the McDowells did not remember reading these specific provisions when they opened the account, Mrs. McDowell testified that she believed that the share draft account functioned in the same manner as a regular bank checking account. A brochure attached to the share draft agreement did, in fact, state that "[s]hare drafts function in every way just like checks...."

In line with the theory that the share draft account functioned like a checking account, the McDowells could write out share drafts just like checks. Furthermore, the parties to whom the share drafts were made out could present those share drafts for payment at one of the offices of the credit union or send them through normal banking channels for presentment to the credit union.

During at least a portion of the time that the McDowells maintained their share draft account at D.T.C.U., the McDowells' bookkeeper was Pat Mitchell. In late July and early August 1984, the McDowells discovered that, over the previous several months, Mitchell had forged Peggy McDowell's signature on fifty-five share drafts. The total amount of those share drafts was allegedly $52,255.02. D.T.C.U. charged all of those drafts against the McDowells' share draft account and, once the forgeries were discovered, refused to reimburse the McDowells.

The McDowells testified that Mitchell's signature was not on the signature card and that they did not authorize Mitchell to sign any share drafts. D.T.C.U. produced evidence that the McDowells requested that D.T.C.U. treat Mitchell as they would treat the McDowells and to provide Mitchell with information necessary to balance and reconcile the share draft statements; however, the evidence also showed that the McDowells never told D.T.C.U. that Mitchell had authorization to sign share drafts or make withdrawals from the share draft account.

During the course of the trial, D.T.C.U. called two witnesses to testify as to the general industry usage in regard to share draft accounts. Both witnesses, one an officer from D.T.C.U. and one an officer from the Texas Credit Union League (T.C.U.L.), testified that the vast majority of credit unions operated their share draft accounts in the same manner as D.T.C.U.

Consistent with the procedure used by a majority of Texas credit unions, the share drafts involved here were paid in one of two ways. First, T.C.U.L. acted as a clearinghouse and processor for share drafts that were deposited or cashed at other institutions. T.C.U.L. recorded certain information from the share drafts onto a magnetic tape, and the tape was then forwarded to D.T.C.U. Unless the share draft was drawn against insufficient funds, payment had been stopped on the share draft, or the account was closed, D.T.C.U. paid the share draft. Neither D.T.C.U. nor T.C.U.L. had any procedure for verifying the depositor's signature on any of the share drafts that were paid in this manner. Indeed, as one of D.T.C.U.'s experts explained, the general industry usage did not even require that share drafts be signed before they were paid.

Additionally, even when share drafts were paid in the second manner, i.e., presented directly to a D.T.C.U. branch office for payment, D.T.C.U. did not verify the depositor's signature. Branch offices had no way to verify signatures because signature cards were only kept at the main office. While there was evidence that the main office had a policy at one time to verify signatures on checks presented for cash at the main office, there was no evidence that the policy was ever followed. Additionally, in this instance, there was no evidence that the main office processed any of the McDowells' share drafts. As a result, it is undisputed that D.T.C.U. did not

verify the signature on any share drafts involved in this case. Although it could have adopted procedures to signature-verify share drafts, D.T.C.U. admitted that, for economic and other reasons, it chose not to adopt such procedures. Although the McDowells did not prevail at trial on the liability issues, the jury found that $51,937.75 would compensate the McDowells for their damages. Additionally, the jury found that the McDowells incurred reasonable attorney fees of $26,700 through the trial of this case and would incur $15,000 in reasonable attorney fees for an appeal to the Court of Appeals, and $10,000 in reasonable attorney fees for an appeal to the Texas Supreme Court. With these facts in mind, we now address points of error three and five.

### General Principles

The third and fifth points of error concern sections 4.406 and 3.406, respectively, of the Texas Business and Commerce Code. Before engaging in a lengthy discussion of these two sections, we will first set out some general legal principles to place the two sections into perspective.

■ Historically, Texas courts have charged banks with knowledge of the signature of a depositor, and a bank would generally be liable to the depositor for any amount of money paid out on a forged check.[2] *See American Indem. Co. v. First National Bank*, 94 S.W.2d 1258, 1261 (Tex.

Civ.App.—Austin 1936, no writ); *See also First State Bank v. Oak Cliff Sav. & Loan Assoc.*, 387 S.W.2d 369, 372 (Tex.1965); *Massachusetts Bonding & Ins. Co. v. Pittsburg Pipe & Supply Co.*, 135 S.W.2d 818, 822 (Tex.Civ.App.—El Paso 1939, writ dism'd judgmt. cor.). This fundamental rule has survived and is now codified in the Texas Business and Commerce Code. *See* TEX.BUS. & COM.CODE ANN. §§ 3.401, 3.418, 4.401 (Vernon 1968).

■ Section 4.401 of the Texas Business and Commerce Code sets forth the general rule that a bank may only charge against a customer's account any item properly payable from that account. *See Ray v. Farmers' State Bank*, 576 S.W.2d 607, 608 (Tex. 1979); TEX.BUS. & COM.CODE ANN. § 4.401 (Vernon 1968). Similarly, section 3.404(a) provides that a person is not liable on an instrument until he has signed the instrument, and any unauthorized signature is wholly inoperative as that of the person whose name is signed. *See First Nat'l Bank v. Hackworth*, 673 S.W.2d 218, 223 (Tex.App.—San Antonio 1984, no writ); TEX.BUS. & COM.CODE ANN. § 3.404(a) (Vernon 1968). In addition, Texas Business and Commerce Code section 3.418 comment 1 states:

> The section follows the rule of *Price v. Neal*, 3 Burr. 1354 (1762), under which a drawee who accepts or pays an instrument on which the signature of the drawer is forged is bound on his acceptance

---

**2.** Throughout this opinion, we will draw no distinction between checks and share drafts or banks and credit unions. D.T.C.U. points out, in its brief, that credit unions differ from banks in that the depositors own the credit union. However, we hold that this distinction in no way excludes credit unions from the rules and duties imposed by Chapter 3 or 4 of the Texas Business and Commerce Code. TEX.REV.CIV. STAT.ANN. art. 2461–12.02(b) (Vernon Supp. 1989). *See Wall v. East Texas Teachers Credit Union*, 526 S.W.2d 148 (Tex.Civ.App.—Texarkana 1975), *rev'd on other grounds*, 533 S.W.2d 918 (Tex.1976).

> Article 2461–12.02(b) states:
> Unless otherwise provided by written agreement of the parties, the rights, responsibilities, and liabilities of a person regarding an item drawn on a credit union, transferred to a credit union, or presented, remitted, collected, settled, negotiated, or otherwise handled by a

credit union, are determined by Chapters 3 and 4, Business & Commerce Code, as if it were drawn on a bank, transferred to a bank, or presented, remitted, collected, settled, negotiated, or otherwise handled by a bank. The record does not reflect that the parties have, by written agreement, exempted themselves from any provisions of Chapter 3 or 4. We conclude, therefore, that they have not. D.T. C.U. asserts that it is excused from any duty it may have to signature-verify share drafts by the language in the share draft agreement stating: "The Credit Union shall be authorized to pay a share draft presented for payment even though the signature or signatures do not correspond exactly with that set forth below." We fail to see how that provision excuses D.T.C.U. from any provision in the Business and Commerce Code; consequently, the parties in this case are subject to the provisions of Chapters 3 and 4 of the Business and Commerce Code.

and cannot recover back his payment. Although the original Act is silent as to payment, the common law rule has been applied to it by all but a very few jurisdictions. The traditional justification for the result is that the drawee is in a superior position to detect a forgery because he has the maker's signature and is expected to know and compare it; a less fictional rationalization is that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered.

The rule as stated in the section is not limited to drawees, but applies equally to the maker of a note or to any other party who pays an instrument.

Consequently, under the code, a bank is still conclusively presumed to know the signature of a depositor and may not charge his account with amounts of any checks not signed by him, no matter how artistic the forgery and regardless of whether the bank was negligent. *See Hackworth,* 673 S.W.2d at 223.

Despite a bank's general duty not to charge forged checks against a customer's account, a bank does have certain statutory defenses that limit or negate this duty. The instant case deals with two such defenses. These defenses are embodied in section 4.406 and section 3.406 of the Texas Business and Commerce Code.

**3.** In pertinent part, section 4.406 states:
(a) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request for instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.
(b) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer in Subsection (a) the customer is precluded from asserting against the bank

*Section 4.406*

Section 4.406 places a duty upon a depositor to promptly examine his bank statement and report to the bank the discovery of any unauthorized signature or any alteration.[3] *La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 561 (Tex.1984); TEX.BUS. & COM.CODE ANN. § 4.406(a) (Vernon 1968). If the depositor fails to comply with this duty, the bank is protected from loss so long as it has exercised ordinary care and paid the item in good faith. *La Sara Grain,* 673 S.W.2d at 561-62; TEX.BUS. & COM. CODE ANN. § 4.406(c) (Vernon 1968). However, if the bank has not exercised ordinary care in paying the forged item or items, the bank is precluded from asserting a 4.406 defense. *See Hanover Ins. Co. v. Brotherhood State Bank,* 482 F.Supp. 501, 504 (D.Kan.1979); *First Nat'l Bank v. Hobbs,* 248 Ark. 76, 450 S.W.2d 298, 302 (1970); TEX.BUS. & COM.CODE ANN. § 4.406(c) (Vernon 1968); Allen, *Commercial Paper: Bank Depositors Duty to Discover and Report Unauthorized Signatures or Alterations,* 86 BANKING L.J. 113, 116-17 (1969). The McDowells assert, in point of error three, that the jury erred, as a matter of law, in finding that the credit union exercised ordinary care. We agree.

The McDowells had the burden, under section 4.406(c), to prove that D.T. C.U. failed to use ordinary care in its treatment of the share drafts. *See Hanover,* 482 F.Supp. at 504; *Industrial Sys., Inc.,*

(1) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and
(2) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.
(c) The preclusion under Subsection (b) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

v. American Nat'l Bank, N.A., 376 So.2d 742, 745 (Ala.1979); Nu–Way Serv., Inc. v. Mercantile Trust Co. Nat'l Assoc., 530 S.W.2d 743, 746 (Mo.Ct.App.1975); TEX. BUS. & COM.CODE ANN. § 4.406(c) (Vernon 1968). However, D.T.C.U. established, through the testimony of two expert witnesses, that it had complied with general usage within the credit union industry. When D.T.C.U. established that it had complied with general industry usage, D.T.C.U., in fact, established a *prima facie* case that it had used ordinary care in its treatment of the share drafts. *Hanover,* 482 F.Supp. at 506; *Industrial Sys.,* 376 So.2d at 745; TEX.BUS. & COM.CODE ANN. § 1.205 comment 6 (Vernon 1968); TEX.BUS. & COM.CODE ANN. § 4.103 comment 4 (Vernon 1968); 6 R. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE 625 (1985). Consequently, the McDowells could prevail at trial only if they could establish that the general industry usage or practice was unreasonable, arbitrary, or unfair. *Rhode Island Hosp. Trust Nat'l Bank v. Zapata Corp.,* 848 F.2d 291, 294 (1st Cir.1988); *Industrial Sys.,* 376 So.2d at 745; TEX. BUS. & COM.CODE ANN. § 4.103 comment 4 (Vernon 1968). In relation to this standard, the McDowells did prove that D.T.C.U. failed to signature-verify *any* of their share drafts. Indeed, the McDowells established that signatures were not even required on share drafts processed through T.C.U.L. and that D.T.C.U. branch offices did not even possess the means to signature-verify checks presented for cash. In light of these facts and for the following reasons, we hold, as a matter of law, that D.T.C.U.'s failure to establish *any* process to signature-verify *any* share drafts was unreasonable, arbitrary, and unfair.

After an exhaustive search, we have found no cases directly on point nor have the parties cited any cases directly on point.[4] Of the published opinions that deal with similar issues, each case involves a situation where the bank employed *some* method of signature verification on *some* of the checks passing through the bank. Even in those cases, the jurisdictions have split as to whether *some* method of verification constitutes ordinary care or meets reasonable commercial standards as a matter of law.

The only cases that add any credence to D.T.C.U.'s argument that the bank used ordinary care are easily distinguished from this case. In *Rhode Island,* 848 F.2d at 291–92, the Court held that the depositor did not meet its burden in proving that the bank failed to exercise ordinary care. The bank examined all signatures on checks over $1,000, and, on all checks between $100 and $1,000, the bank randomly verified the signatures on one percent of the checks. The bank also produced extensive evidence of the commercial reasonableness of these practices. The depositor, on the other hand, produced absolutely no evi-

---

4. Despite the fact that we find no cases that directly address this question, at least two cases provide some support for our specific holding that D.T.C.U. failed to exercise ordinary care as a matter of law. *See Hanover,* 482 F.Supp. at 505 (fact that bank had no procedure for signature-verifying checks was significant in concluding that bank failed to exercise ordinary care); *Exchange Bank & Trust Co. v. Kidwell Constr. Co.,* 463 S.W.2d 465, 470–71 (Tex.Civ.App.—Tyler 1971), writ ref'd n.r.e., 472 S.W.2d 117 (1971) (bank's failure to accurately check all signatures contributed to a finding of failure to use ordinary care). Moreover, a number of cases state that ordinary care is *typically* a question of fact for the fact finder, but those cases do not preclude the possibility that a court can find that a bank failed to exercise ordinary care as a matter of law. *Garnac Grain Co. v. Boatmen's Bank & Trust Co.,* 694 F.Supp. 1389, 1401 (W.D.Mo. 1988); *K & K Mfg. Inc. v. Union Bank,* 129 Ariz. 7, 628 P.2d 44, 46 (Ct.App.1981); *Five Towns College v. Citibank, N.A.,* 108 A.D.2d 420, 489 N.Y.S.2d 338, 344 (App.Div.1985). D.T.C.U. relies on dictum in *Exchange Bank* for the proposition that determining ordinary care is the province of the trier of fact. *Exchange Bank,* 463 S.W.2d at 470–71. However, the court's holding only concludes that there was some evidence to support the trial court's determination that the bank failed to exercise ordinary care. *Id.* Moreover, the Texas Supreme Court, in its opinion on refusal of the writ of error, specifically stated that it only approved that portion of the holding by the Tyler Court of Appeals that there was some evidence to support the trial court's finding. *Exchange Bank,* 472 S.W.2d at 118. We do not interpret the court of appeals' decision in *Exchange Bank* as holding or standing for the proposition that a court may *never* find a lack of ordinary care as a matter of law.

dence to rebut the commercial reasonableness of the process used to verify signatures. The key distinction between *Rhode Island* and the case at bar is that in *Rhode Island* the bank employed *some* type of process to verify signatures. In this case, D.T.C.U. did not use *any* process to verify the signatures on *any* checks. In summary, in *Rhode Island* there was evidence that *some* type of process was used to verify signatures on *some* checks and there was also evidence that the process used was commercially reasonable. In the instant case, there was no evidence that *any* process was used to verify signatures on *any* of the share drafts. Thus, we conclude that *Rhode Island* is significantly distinguishable.

Similarly, D.T.C.U. seems to imply that *Vending Chattanooga, Inc. v. American Nat'l Bank & Trust*, 730 S.W.2d 624 (Tenn. 1987), would conflict with our holding in this case. If D.T.C.U. is implying that, we disagree. The fact statement in *Vending Chattanooga* does not reveal whether the bank verified the signature on every check, verified the signature on some checks, or failed to verify the signature on any check. However, from the holding in that case, we infer that some checks, if not all checks, received some visual inspection of the customer's signature. The court quoted U.C.C. statutory language in holding that a bank exercises ordinary care when it pays a check in good faith and in accordance with reasonable commercial standards of the banking industry. *Id.* at 628. Specifically, however, the court in *Vending Chattanooga* only held that the duty of ordinary care for a bank was *not* so severe and exact as to find a bank "negligent in failing to *closely* compare the signature of *each* forged check with the signature card." *Id.* (emphasis added). On the other hand, we are holding that a bank or credit union does not exercise ordinary care when it fails to use *any* procedure to compare the signature of *any* checks or share drafts with the signature card. Consequently, in our opinion, the reasoning and holding in *Vending Chattanooga* does not in any way conflict with our holding in the instant case.

D.T.C.U. further relies on *Vending Chattanooga* for the proposition that ordinary care and reasonable commercial standards are fact issues that should not or can not be determined by a court as a matter of law. We do not read *Vending Chattanooga* as standing for that proposition. In fact, the court in *Vending Chattanooga* states:

Such a rule [article 4.406 of the U.C.C.] does not require the bank to be a handwriting expert on the signature of each check, and on the other extreme a bank would be negligent in honoring a check with no signature at all.

730 S.W.2d at 628. Clearly, the court realized that an occasion could arise where a court could decide the issue of ordinary care or reasonable commercial standards as a matter of law. In fact, according to one of D.T.C.U.'s experts in this case, the checks were not even examined to determine if the check was signed. Consequently, even under the dictum in *Vending Chattanooga*, D.T.C.U. would not, as a matter of law, meet its duty of ordinary care and would not comply with its duty to act in accordance with reasonable commercial standards.

The McDowells, in support of their argument, cite two cases: *Wilder Binding Co. v. Oak Park Trust & Sav.*, 173 Ill.App.3d 34, 122 Ill.Dec. 856, 527 N.E.2d 354 (1988) and *Medford Irrigation Dist. v. Western Bank*, 66 Or.App. 589, 676 P.2d 329 (1984). While both of these cases can also be distinguished by the fact that the bank in each case employed some method to signature-verify checks, these two cases do contain some excellent public policy arguments.

In *Medford*, a bookkeeper forged checks that were ultimately charged against a depositor's account. *Medford*, 676 P.2d at 331. The bank in *Medford* raised the same defenses under sections 3.406 and 4.406 that D.T.C.U. raises in the case at bar. *Id.* The evidence revealed that the bank followed general banking usage and automatically paid all checks under $5,000 without any procedure designed to detect unauthorized signatures. *Id.* at 331–32. The court stated that "[w]hile that approach, based

on considerations of the cost and efficiency, may be a prudent business decision and followed by most banks, it does not meet the bank's responsibility under the statutes." *Id.* at 332. The court went on to hold, as a matter of law, that the bank's failure to signature-verify checks under $5,000 was a failure to exercise ordinary care and a failure to act in accordance with reasonable commercial standards. *Id.* at 333.

The court in *Wilder* reached the same conclusion as the court in *Medford*. *Wilder*, 527 N.E.2d at 358. In *Wilder*, the bank also paid checks forged by the depositor's bookkeeper. *Id.* at 355. The bank did not signature-verify any checks of $1,000 or less, and it was established at trial that this was the common practice for banks in that area. *Id.* at 356. However, the court held, as a matter of law, that this practice was not commercially reasonable and that the bank failed to exercise ordinary care because the bank's check processing procedure did not reasonably relate to the detection of unauthorized signatures. *Id.* at 358.

We certainly agree with *Medford* and *Wilder* that the procedure a bank uses to process checks and review signatures must reasonably relate to the duty the bank has to detect unauthorized signatures.[5] *Medford*, 676 P.2d at 332; *see Wilder*, 527 N.E.2d at 358; *see* TEX.BUS. & COM. CODE ANN. § 4.401 (Vernon 1968); TEX. BUS. & COM.CODE ANN. § 3.401 (Vernon 1968); TEX.BUS. & COM.CODE ANN. § 3.418 comment 1 (Vernon 1968); *Allen* at 117; 7 ANDERSON at 211–12. If the procedure does not reasonably relate to the bank's duty to verify signatures, the procedure can not be considered an exercise of ordinary care or an act in accordance with reasonable commercial standards. *Med-*

*ford*, 676 P.2d at 332; *see Wilder*, 527 N.E.2d at 358.

◼ Furthermore, the mere fact that all banks use the same or similar procedures is immaterial if the procedures do not comport with the bank's statutory duties to the depositor. *Wilder*, 527 N.E.2d at 357–58; *Medford*, 676 P.2d at 332; *see Hanover*, 482 F.Supp. at 506; 7 ANDERSON at 213. In effect, D.T.C.U. asks this Court to conclude that "general banking usage" can excuse a bank from duties expressly imposed upon it by the legislature in the Texas Business and Commerce Code. Specifically, D.T.C.U. would have us hold that it may be excused from its statutory duty to verify a depositor's signature as long as a majority of other banks act in the same manner. We refuse to embark on such a perilous trail. The legislature has seen fit to statutorily impose a duty to signature-verify; the legislature is also the proper body to enact a change in this duty. *See Hanover*, 482 F.Supp. at 509; *Madison Park Bank v. Field*, 64 Ill.App.3d 838, 21 Ill.Dec. 583, 381 N.E.2d 1030, 1032 (1978). We decline D.T.C.U.'s invitation to legislate.

As D.T.C.U. admitted at trial, it made an economic decision to refrain from signature-verification. D.T.C.U. could have verified each check, but it chose to save money by not verifying *any* checks. D.T.C.U., therefore, made a conscious decision to absorb any possible loss occurring through undetected forgeries. An entire industry, by adopting such a procedure to save time, effort, or money, cannot be permitted to set its own uncontrolled standard. *Hanover*, 482 F.Supp. at 506, *quoting* W. PROSSER, LAW OF TORTS 167 (1971). Consequently, for the reasons heretofore set out, we sustain the McDowells' third point of error and hold that D.T.C.U. failed to exercise ordinary care as a matter of law.

---

5. We do not necessarily adopt the explicit holdings in *Medford* and *Wilder*. In both of those cases, the bank verified the signatures of depositors if their checks were over a certain amount. Our holding in this case should not be interpreted to mean that the practice of signature verifying checks over a certain amount could not constitute ordinary care; nor should it be interpreted to mean that such a procedure would

constitute ordinary care. We simply do not address that issue and our holding in the instant cause should not be interpreted as a comment, one way or the other, as to how we would rule in such a case. In the instant case, there is absolutely no evidence that D.T.C.U. employed *any* method for detecting forgeries, and our holding is expressly limited to that fact situation.

### Section 3.406

As with section 4.406, section 3.406 of the Texas Business and Commerce Code provides a defense for banks that cash forged checks.[6] Section 3.406 precludes the depositor from asserting wrongful payment against the bank if the depositor's negligence substantially contributed to the alteration or forgery of the check as long as the bank paid the instrument in good faith and in accordance with the reasonable commercial standards of the payor's business. *See Ray*, 576 S.W.2d at 609. If the bank did not pay the instrument in good faith and in accordance with reasonable commercial standards, the bank is liable to the depositor regardless of the depositor's negligence. *See Hermetic Refrigeration Co. v. Central Valley Nat'l Bank, Inc.*, 493 F.2d 476, 477–78 (9th Cir.1974); *American Mach. Tool Distrib. Assoc. v. Nat'l Permanent Fed. Sav. & Loan Assoc.*, 464 A.2d 907, 912–15 (D.C.1983); *Owensboro Nat'l Bank v. Crisp*, 608 S.W.2d 51, 53 (Ky.1980); *Ed Stinn Chevrolet, Inc. v. National City Bank*, 28 Ohio St.3d 221, 503 N.E.2d 524, 534 (1986). In point of error five, the McDowells claim that there is no evidence that D.T.C.U. paid the share drafts in good faith and in accordance with reasonable commercial standards.

Unlike section 4.406, D.T.C.U. has the burden of proof under section 3.406 on the issue of whether it acted in good faith and in accordance with reasonable commercial standards. *See Perley v. Glastonbury Bank & Trust Co.*, 170 Conn. 691, 368 A.2d 149, 155 (1976); Whaley, *Negligence and Negotiable Instruments*, 53 N.C.L.REV. 1, 14 (1974). However, by showing that it complied with general banking usage, D.T.C.U. established a *prima facie* case that it acted in accordance with reasonable commercial standards.

TEX.BUS. & COM.CODE ANN. § 1.205 comment 6 (Vernon 1968); TEX.BUS. & COM.CODE ANN. § 4.103 comment 4 (Vernon 1968);[7] *see Perley*, 368 A.2d at 155; *American Mach. Tool*, 464 A.2d at 915; *cf. Hanover*, 482 F.Supp. at 506–08 (the statement regarding a *prima facie* case deals specifically with section 4.406 but the court infers that the rule would also apply to section 3.406). At that point, the burden of proof shifted to the McDowells to show that the common banking usage was unreasonable, arbitrary, or unfair. *See* TEX.BUS. & COM.CODE ANN. § 4.103 comment 4 (Vernon 1968); *cf. Industrial Sys.*, 376 So.2d at 745 (dealing specifically with section 4.406 defense and not section 3.406).

In this case, D.T.C.U. proved its *prima facie* case by producing evidence to show that it complied with general usage within the credit union industry. However, as stated in our discussion of section 4.406, the McDowells established at trial that D.T.C.U. did not have any procedure to signature-verify checks. We held, under our analysis of section 4.406, that the credit union's failure to adopt *any* procedure to signature-verify checks could not, as a matter of law, constitute ordinary care. As both parties to this suit have admitted, the bank's duty to use ordinary care, under section 4.406, and to act in accordance with reasonable commercial standards, under section 3.406, is the same. *Rhode Island*, 848 F.2d at 293; *Garnac Grain Co.*, 694 F.Supp. at 1398 n. 13 (W.D.Mo.1988); Whaley at 14 n. 50. Consequently, because we hold, as a matter of law, in our analysis of section 4.406, that D.T.C.U. failed to exercise ordinary care, we also hold, as a matter of law, for the same reasons, that D.T.C.U. failed to act in accordance with reasonable commercial standards under sec-

---

**6.** Section 3.406 of the Texas Business & Commerce Code states:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable com-

mercial standards of the drawee's or payor's business.

**7.** Comment 4 to section 4.103 is persuasive authority in this instance because the "provisions of [Chapter 3] are subject to the provisions of the chapter on Bank Deposits and Collections (Chapter 4)". TEX.BUS. & COM.CODE ANN. § 3.103(b) (Vernon 1968).

tion 3.406. The procedures used by D.T.
C.U. to process checks and review signa-
tures must have reasonably related to the
detection of unauthorized signatures in or-
der to have been in accordance with reason-
able commercial banking standards. *See
Medford*, 676 P.2d at 332; *Wilder*, 527
N.E.2d at 358. There is no evidence that
D.T.C.U.'s check cashing procedure *reason-
ably* related to the detection of unautho-
rized signatures; consequently, there is no
evidence that the bank acted in accordance
with *reasonable* commercial standards.

We sustain the McDowells' third and
fifth points of error, reverse the judgment
of the trial court, and render judgment for
the McDowells in the amount of $51,937.75,
award reasonable attorney fees of $26,700
for the trial below, $15,000 for appeal to
this Court, and $10,000 if appealed to the
Texas Supreme Court. TEX.R.APP.P.
80(b). In light of our disposition of the
McDowells' third and fifth points of error,
we need not reach the McDowells' remain-
ing points.