NEW JERSEY STEEL CORPORATION, A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFF, AND HARTFORD IN-SURANCE COMPANY, AS SUBROGEE AND/OR ASSIGNEE OF NEW JERSEY STEEL CORPORATION, PLAINTIFF–INTERVE-NOR–RESPONDENT, v. RUPERT WARBURTON, RITA SINGH WARBURTON, MAPICS, INC., DOING BUSINESS AS MAPICS

UNLIMITED, INC., RUPERT WARBURTON, INDIVIDUALLY
AND DOING BUSINESS AS MPS, MM SYSTEMS, M. MINIMI-
CRO, MINIMICRO MAPICS, INC. AND MAPICS UNLIMITED,
INC., JOHN DOE (A FICTITIOUS NAME) AND ABC CORPORA-
TION (A FICTITIOUS CORPORATION), DEFENDANTS, AND
MIDLANTIC NATIONAL BANK, DEFENDANT–APPELLANT.

Argued January 3, 1995—Decided April 12, 1995.

Gregg S. Sodini argued the cause for appellant (Cuyler, Burk & Matthews, attorneys).

Marc R. Lepelstat argued the cause for respondent (Lambert & Weiss, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the allocation of check-fraud losses under specific provisions of Articles 3 and 4 of the Uniform Commercial Code ("UCC"), adopted in New Jersey as *N.J.S.A.* 12A:3–406 and *N.J.S.A.* 12A:4–406. The Court must allocate those losses between a corporation whose negligence allowed the defalcation to occur and a depository-payor bank that accepted checks for deposit without following its own procedures for inspecting the endorsements on those checks. Defendant Midlantic National Bank ("Midlantic Bank") failed to discern endorsements that did not

correspond to the payees as well as forged maker signatures, thus violating its duty to pay an instrument "in accordance with reasonable commercial standards" and to exercise "ordinary care." Plaintiff, New Jersey Steel Corporation ("N.J. Steel"), failed to examine its monthly statements, thus violating its statutory and contractual duty "to exercise reasonable care and promptness to examine the statements and items to discover ... unauthorized signature or any alteration on an item."

# I

Prior to 1984, defendant Rupert Warburton ("Warburton") was an employee of N.J. Steel. In 1984, Warburton formed his own independent computer consulting business that operated under the trade name of Mapics Unlimited. N.J. Steel hired Warburton as its independent computer consultant, thus allowing him access to its computerized financial and accounting systems. With that access, Warburton devised and implemented a plan to defraud N.J. Steel. Warburton's plan began with "waste checks"—blank checks that were left in N.J. Steel's computer room—and ended with deposits into accounts opened by Warburton for his personal and business use. Warburton would write those checks to fictitious payees whose names resembled, but were not identical to, the trade name of his own consulting business, which was the name on the depositing bank account. For example, he made the checks payable to "M.P.S." and "M.M. Systems," but the name of his business and corresponding bank account was "Mapics Unlimited." Warburton was the sole authorized signatory for the Mapics account. Next he would fill in an amount payable that was identical to the amount of a legitimate, previously issued check. Warburton then would forge the name of one or both of the authorized signatories for N.J. Steel's account at Midlantic Bank.

He would then endorse each check with only the words "For deposit" or "For deposit only," followed by 362010144, the account number for Mapics Unlimited, rather than the account number for the payee. Indeed, the name of the fictitious payee did not appear

in the endorsement; no one signed the endorsement on behalf of that payee; and the checks were not endorsed for deposit into an account in the name of the payee. The tellers made no attempt to verify whether account 362010144 belonged to the named payee of each check. Instead, each forged check was subsequently deposited in the Mapics Unlimited account at the Rossmoor branch of Midlantic Bank, and the bank transferred funds from N.J. Steel's account to Warburton's account. Midlantic Bank, therefore, was both the payor and the depository bank for those checks.

To complete his plan, Warburton would obtain N.J. Steel's monthly statements from Midlantic Bank, remove and destroy each forged check, and replace it with the corresponding previously negotiated check. He would also adjust N.J. Steel's computer records to reflect that the only payee was that of the corresponding previously negotiated check. From November 1989 to October 1990, Warburton completed this scheme fourteen times, depositing checks with sums ranging from $19,083.40 to $64,146.98, for a personal gain of $571,931.90. N.J. Steel did not discover that loss until January 1991, whereupon it immediately notified Midlantic Bank.

One of the reasons Warburton was able to escape detection for so long was that in early 1990, he had convinced N.J. Steel to abandon its manual check-reconciliation process in favor of a computerized process he conducted himself. Previously, N.J. Steel and Midlantic Bank had entered into an account reconciliation plan that provided in pertinent part:

> The Corporation agrees it will examine its statement and items for unauthorized signatures, items paid but not issued or alterations. Failure by the Corporation to notify the Bank of any unauthorized signatures, items paid but not issued or alterations within 14 days of the Corporation's receipt of statement and items will bar the Corporation's right to assert a claim against the Bank for subsequent unauthorized signatures, items paid but not issued or alterations, by the same person.

> The Corporation understands that Midlantic will exercise reasonable care in providing the Account Reconciliation Plan described herein on behalf of the Corporation. The Corporation hereby agrees that Midlantic shall have no liability regarding any item processed with reasonable care under this agreement.

Although the corporation received all the monthly statements and cancelled checks in a timely manner, N.J. Steel failed to perform a manual reconciliation or to examine its cancelled items for unauthorized signatures pursuant to its agreement with Midlantic Bank.

In addition to that agreement between the parties, Midlantic Bank adopted and put into place institutional policies that governed its acceptance of customers' deposits. Midlantic Bank's Policy 5.1 provides, "For deposits containing 5 checks or less, the teller must read each endorsement to make sure that it is correct.... By reading endorsements, the teller is responsible for verifying endorsements on all checks deposited." Policy 5.1 also provides, "Any single check over $10,000 must be initialed by two tellers (the one accepting the deposit and another teller evidencing a thorough review of the transaction) on the back." None of the checks at issue bear such initials. Midlantic Bank's Policy 7.4 provides, "[c]hecks drawn to the order of a corporation must be deposited in an account bearing the same title and cannot be transferred by endorsement to any individual or another company."

In January 1991, N.J. Steel sued Warburton, Midlantic Bank, and other defendants seeking damages in connection with the forged checks. N.J. Steel alleged in its amended complaint that Midlantic Bank was liable under several alternative theories: strict liability for accepting and negotiating checks without properly authorized signatures (count 4); strict liability for accepting checks without proper endorsements (count 5); negligently accepting checks without properly authorized signatures (count 6); negligently accepting checks without endorsements of the named payees (count 7); and failure to act within generally accepted commercial practices in debiting N.J. Steel's account for checks having forged signatures and missing proper endorsements (count 8). Midlantic Bank asserted various affirmative defenses and cross-claims for indemnification and contribution, including that N.J. Steel's action was barred or diminished in whole or part

because its loss had been caused by its own contributory or comparative negligence. In February 1991, N.J. Steel obtained a Consent Judgment against all defendants except Midlantic Bank. Subsequently, Hartford Insurance Company intervened in the action as partial subrogee and/or assignee of N.J. Steel against each defendant, including Midlantic Bank.

After extensive discovery, the case was tried without a jury. At trial an employee of Midlantic Bank testified to the bank's internal procedures for inspection of deposited checks for proper endorsements. He testified that tellers must read each endorsement if the deposit contained five or fewer checks, and must fan the checks to determine the presence or absence of endorsements if the deposit contained more than five checks. Moreover, under the same policy directive, any single check for more than $10,000 must be examined by two tellers. The witness also testified that if the account number in an endorsement on the reverse side of a check did not match the payee's account number, the teller was required to reject the check as incorrectly endorsed under Policy 5.1. N.J. Steel's expert compared the bank's institutional policies to the industry standards and concluded that the bank had been negligent because it had not followed those policies.

The trial court found that the subject checks were not properly endorsed because the endorsements did not contain the name of the payee and the checks were endorsed for deposit "into an account of one other than the [named] payee." The trial court further found that Midlantic Bank had failed to follow its own written policy and procedures concerning inspection of checks for proper endorsements: "I find that [Midlantic's policy] was not followed since a thorough review of these checks by a trained teller would have revealed the inadequacy of the endorsements." Finally, based on the testimony of N.J. Steel's expert, the trial court determined that Midlantic Bank's failure to review properly the endorsements constituted a violation of the "ordinary procedures in the banking industry" and that Midlantic Bank's acceptance of the checks without proper endorsements was a "proxi-

mate cause" of N.J. Steel's loss. The trial court, however, refused to find that Midlantic Bank had violated its Policy 7.4.

The trial court concluded that since Midlantic Bank failed to exercise ordinary care in paying the subject checks, it could not invoke *N.J.S.A.* 12A:4–406 as a defense. In assessing damages, the trial court held that plaintiff's claim with respect to the first forged check was time-barred under *N.J.S.A.* 12A:4–406(4). The trial court calculated the total damages to be $247,264.15. Finally, the trial court held that N.J. Steel was not entitled to recover prejudgment interest because of "the equities of the situation." In reaching that conclusion, the trial court found that N.J. Steel had failed to examine its account statements and thereby contributed to the perpetration of the fraud.

The Appellate Division affirmed in a *per curiam* opinion "substantially for the reasons stated by [the trial court]." We granted Midlantic Bank's petition for certification. 137 *N.J.* 166, 644 *A.*2d 614 (1994).

## II

Although both *N.J.S.A.* 12A:3–406 and *N.J.S.A.* 12A:4–406 govern this case, we discuss first *N.J.S.A.* 12A:4–406.

12A:4–406. Customer's Duty to Discover and Report Unauthorized Signature or Alteration.

(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen

calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

■ The provisions of *N.J.S.A.* 12A:4–406 are to be read in conjunction with one another. *N.J.S.A.* 12A:4–406(1) establishes the customer's duty to discover and report unauthorized signatures or alterations. *N.J.S.A.* 12A:4–406(2) precludes the customer from making various assertions against the bank if the bank has established the customer's breach of that duty as outlined in provision (1). However, under *N.J.S.A.* 12A:4–406(3), a bank may assert that preclusion only if it paid the check in "good faith" and the customer is unable to establish "lack of ordinary care on the part of the bank in paying the item(s)." Therefore, provisions (1) and (2) are inoperative if the customer can establish that the bank has also been negligent. In a transaction where both parties might be negligent, the loss stemming from the combined effect of those three provisions is on the last party found negligent: the payor bank (also referred to as the drawee bank). That is made clear by the New Jersey Study Comment to *N.J.S.A.* 12A:4–406(3):

3. Subsection 4–406(3) makes the rules of subsections 4–406(1) and (2) inoperative if the bank, itself, has been negligent. In other words, a negligent bank cannot put the loss resulting from a forgery or the like onto the customer on the ground that the customer also has been negligent. There is no New Jersey statutory or case law precisely on point, but the rule of subsection 4–406(3) seems to be simply an application of the general rule of contributory negligence; where both the plaintiff and the defendant have been negligent, let the loss remain where it has fallen.

That comment has been cited with approval in *Faber v. Edgewater Nat'l Bank of Edgewater*, 101 *N.J.Super.* 354, 359, 244 *A.*2d 339 (Law Div.1968), in which the court reasoned that "sub-section 4–406(3) makes the rules regarding due diligence inoperative if the bank, itself, has been negligent. In other words, a negligent bank cannot put the loss resulting from a forgery or the like onto the customer on the ground that the customer also has been negligent." *Id.* at 359, 244 *A.*2d 339 (citing *N.J.S.A.* 12A:4–406 Study Comment.)

In reviewing the same UCC provision in effect in New York, the New York Court of Appeals held that "[u]nder (both UCC 4–406 and 3–406), when both the bank and its customer have been negligent and even when the customer is by far the more negligent party, the entire loss may still be asserted against the bank." *Putnam Rolling Ladder Co. v. Manufacturers Hanover Trust Co.,* 74 *N.Y.*2d 340, 547 *N.Y.S.*2d 611, 546 *N.E.*2d 904 (1989) (citing David Morris Phillips, *The Commercial Culpability Scale,* 92 *Yale L.J.* 228, 240 n. 62 (1982)).

### III

12A:3–406. Negligence Contributing to Alteration or Unauthorized Signature. Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business. *L.* 1961, *c.* 120, § 3–406.

*N.J.S.A.* 12A:3–406 is broader in scope than *N.J.S.A.* 12A:4–406. Under *N.J.S.A.* 12A:3–406, a customer "who by his negligence substantially contributes" to the loss is estopped from recovering against a payor bank that is required to "pay[ ] the instrument in good faith and in accordance with ... reasonable commercial standards." Again, the initial loss is imposed on the customer who is negligent. However, the effectiveness of the bar to recovery is conditioned on the payor bank having acted pursuant to the reasonable commercial standards of the banking business.

Under *N.J.S.A.* 12A:3–406, the slightest contributory negligence on the part of the bank makes the defense of the customer's negligence unavailable. Donald J. Rapson, *Loss Allocation in Forgery and Fraud Cases: Significant Changes Under Revised Articles 3 and 4,* 42 *Ala.L.Rev.* 435 (1991). Significantly, the comments to revised article 3, approved by the National Conference of Commissioners on Uniform State Laws and the American Law Institute in 1990, explain: "The 'substantially contributes' test is meant to be less stringent than a 'direct and proximate

cause' test. Under the less stringent test the preclusion should be easier to establish." UCC Revised Article 3, § 3–406 cmt 2, 2 *U.L.A.* 105 (1991). Although "reasonable commercial standards" are not defined in that section of the New Jersey law, the New Jersey Study noted that "any bank which takes or pays an altered check which ordinary banking standards would require it to refuse cannot take advantage of the estoppel." New Jersey Study Comment to *N.J.S.A.* 12A:3–406(6) (1994).

Therefore, a negligent customer may shift total liability to the payor bank by showing that the bank negligently failed to conform to industry standards in paying the item contrary to the customer's order. At least one court has held that it is commercially unreasonable to accept for deposit a check made out to a corporate entity but endorsed for deposit to a personal account. *See In re Lou Levy & Sons Fashions, Inc. Litig.*, 988 *F*.2d 311, 313–14 (2d Cir.1993) (applying New Jersey law, court found bank negligent in accepting checks with endorsements containing account number for individual account where named payee was corporation; bank therefore could not invoke drawer's negligence as preclusion under § 3–406). Another court has stated "the [payor] bank has a duty to make payment only to the payees named in its depositors' checks or to their order. Consequently, the [depository] bank as a general rule has a duty to determine the identity of the payee." *Hanover Ins. Cos. v. Brotherhood St. Bank*, 482 *F.Supp.* 501, 505 (D.Kan.1979).

A lack of ordinary care on the part of the bank paying items under this provision of the UCC "may be established by proof either that the bank's procedures were below standard or that the bank's employees failed to exercise care in processing the items." *First Nat'l Bank & Trust Co. v. Cutright*, 189 *Neb.* 805, 205 *N.W.*2d 542, 545 (1973) (cited in UCC § 3–406, at n. 9). For a payor bank to escape liability, it must establish that it acted in accordance with reasonable commercial standards and exercised ordinary care. *Schoenfelder v. Arizona Bank*, 165 *Ariz.* 79, 796

P.2d 881, 890 (1990); *First Bank & Trust of Jonesboro v. Vaccari*, 288 *Ark.* 233, 703 *S.W.*2d 867 (1986).

## IV

Pursuant to the Account Reconciliation Plan Operating Agreement that it had entered into with Midlantic Bank, and under *N.J.S.A.* 12A:4–406(1), N.J. Steel owed a duty to Midlantic Bank to examine within a reasonable time any cancelled checks and account statements received and to give timely notice of any irregularities. *Western Union Tel. Co. v. Peoples Nat'l Bank*, 169 *N.J.Super.* 272, 278, 404 *A.*2d 1178 (App.Div.1979). N.J. Steel is not excused from that duty by having entrusted its performance to an incompetent or dishonest agent, like Warburton. *Faber, supra*, 101 *N.J.Super.* at 360, 244 *A.*2d 339.

By its own admission, N.J. Steel was negligent in supervising Warburton. As an independent computer consultant, Warburton advised N.J. Steel to abandon its manual check-reconciliation process in favor of a computerized process that he conducted himself. In so doing, N.J. Steel put Warburton in a position to perpetrate his fraudulent plan, and then failed to perform both its statutory obligations under *N.J.S.A.* 12A:4–406(1) and its contractual duties under the account-reconciliation plan with Midlantic Bank. Thus, under the statute, N.J. Steel would be liable for the checks due solely to its duty to discover and report unauthorized signatures or alterations, if Midlantic Bank could affirmatively establish that N.J. Steel's "negligence in inspecting the statements or giving notice of the forgeries *caused* the loss." *Schoenfelder, supra*, 796 *P.*2d at 884.

However, any lack of reasonable care and promptness in the conduct of N.J. Steel "in examining its bank statements is of no weight under the statutory scheme if the bank is proven to have failed to use ordinary care in paying the items." *Hanover, supra*, 482 *F.Supp.* at 505 (citing *Taylor v. Equitable Trust Co.*, 269 *Md.* 149, 304 *A.*2d 838 (1973)). N.J. Steel can shift liability solely to Midlantic Bank by proving the bank's lack of ordinary care under

*N.J.S.A.* 12A:4–406(3). Under that provision, the bar to recovery by N.J. Steel from *N.J.S.A.* 12A:4–406(1) and (2) does not apply if the payor bank failed to exercise ordinary care in paying an item. *Hanover, supra,* 482 *F.Supp.* at 505.

Midlantic Bank is both the depository and payor bank. Because a payor bank "has a duty to make payment only to the payees named," a depositary bank "has a duty to determine the identity of the payee" of its depositor's checks. *Ibid.* (citing *American Nat'l Bank of Denver v. First Nat'l Bank of Denver,* 130 *Colo.* 557, 277 *P.*2d 951 (1954); *First Nat'l Bank of Nevada v. Dean Witter & Co.,* 84 *Nev.* 303, 440 *P.*2d 391 (1968); *Maynard Inv. Co. v. McCann,* 77 *Wash.*2d 616, 465 *P.*2d 657 (1970)). If it had acted only as payor bank, Midlantic Bank could have recovered from the depository bank. *E.g., Nutt v. Chemical Bank,* 231 *N.J.Super.* 57, 61, 555 *A.*2d 8 (App.Div.1989). However, Midlantic Bank assumed dual roles of responsibility. Thus, Midlantic Bank's position that it has no duty to examine the checks as to the named payees is "totally unacceptable." *Hanover, supra,* 482 *F.Supp.* at 505. Instead, that "bank's lack of ordinary care may be demonstrated by proof that the bank's procedures were below the standard or that the bank's employees failed to exercise due care in processing the items." *Ibid.* (citing *Cutright, supra,* 205 *N.W.*2d at 542).

The trial court found N.J. Steel had demonstrated that Midlantic Bank failed to exercise ordinary care by proof that although the bank had developed institutional procedures for deposits that would meet the appropriate standard of care, that bank's employees failed to exercise due care in following those procedures. They failed to verify the endorsement appearing on each check and to ensure that the checks were endorsed to the named payee. Midlantic Bank's own institutional policies required its tellers to check carefully the endorsements of deposits of less than five checks and to seek supplemental review from another teller with endorsements on checks for more than $10,000. Therefore, the checks at issue merited careful review by Midlantic Bank's em-

ployees because of the amounts as well as the quantity of the deposited checks. However, Midlantic Bank did not check the endorsements. Midlantic Bank accepted large checks for deposit that bore neither the business account's name as payee nor an endorsement matching the payee of the check.

■ Midlantic Bank failed to prove that it acted in accordance with industry standards as well as its own institutional policies. In its role as depository bank, Midlantic Bank attempted to do so only through cross-examination of experts who acknowledged that tellers and other bank personnel often interpret literally the industry standard of "Know your endorser" by ignoring institutional policies for a customer who frequented the bank and could chit-chat with the teller about his family. Although "local banking practices may be useful in determining the standard required," we refuse to find that the practices of individual tellers might provide support for minimal standards that, if actually put in place, would "amend the statutory requirements." *Hanover, supra,* 482 *F.Supp.* at 506. Moreover, the testifying experts concluded that such common practice by tellers or other bank personnel does not comport with reasonable commercial standards. Thus, notwithstanding any prevailing local custom in the banking industry, we agree with the trial court that Midlantic Bank's tellers did not conduct a thorough review of the endorsements, which would have revealed the inconsistency between the payee and the authorized payee on the account number written as an endorsement.

■ Although not relied on by the lower courts in holding Midlantic Bank liable, that Warburton forged the names of the authorized signatories on all checks is undisputed. N.J. Steel's expert testified that the normal procedure for the payor bank's processor would have been to compare the maker signatures found on a quantity of checks for the corporation in question. For example, viewing thirty checks in that manner would highlight any differences or similarities in maker signatures. When more than one signature is identified on checks for one corporation, the bank's processor would then check them against the authorized

signature card on file to ascertain the number of authorized signatures. Under that example, the expert concluded that any processor who used such procedures would have discovered the fraud in this case. Therefore, in addition to missing the irreconcilable differences in the endorsement account numbers and the varied but fraudulent payees, Midlantic Bank's employees also missed the unauthorized signature on each check. Thus, the expert concluded that those checks were not properly payable. Although Midlantic Bank's expert testified that the forgeries were so good that a lay person would fail to detect them, we question whether a processor in a bank is such a lay person. Based on the record, we conclude that one could find Midlantic Bank also liable to N.J. Steel for its failure to catch the forged maker signatures, under both *N.J.S.A.* 12A:3–406 and 4–406.

Midlantic Bank argues that this case is one of double forgery and asserts that under that theory, it would not be liable. *See Brighton, Inc. v. Colonial First Nat'l Bank,* 176 *N.J.Super.* 101, 115, 422 *A.*2d 433 (App.Div.1980) (adopting rule from *Perini Corp. v. First Nat'l Bank,* 553 *F.*2d 398 (5th Cir.1977), which requires double forgery cases to be treated "as if they involved forged drawer's signatures alone"), *aff'd p.c.o.b.,* 86 *N.J.* 259, 430 *A.*2d 902 (1991). However, the record does not indicate a case of double forgery. Double forgery consists of a forged maker's signature *and* a forged endorsement. While Warburton certainly forged the names of authorized signatories of the corporation's account, his endorsement consisted of the words "For deposit only" followed by a *valid* account number for his consulting business. That endorsement was not forged. Here the problem resulted from the teller's failure to use the endorsement to compare the authorized payees of that account with the payee on the check.

In addition to the underlying facts, cases of double forgeries are problematic for a reason inapplicable to this case: a decision to treat a case as one of a forged signature results in loss to the payor bank whereas treatment by the courts as a forged endorse-

ment shifts the loss to the depository bank on its warranty covering forged endorsements. *See* Rapson, *supra,* 42 *Ala.L.Rev.* at 468. As has been outlined above, Midlantic Bank is both payor and depository bank. Therefore, its argument of double forgery is confusing because liability falls on it due to its roles as a payor and a depository bank, rather than the degree of forgery involved. The rule adopted in *Brighton, supra,* is distinguishable from the present case because of the type of negligent conduct as well as the different factual scenario. *See Hanover, supra,* 482 *F.Supp.* at 508. Thus, we find that the holding of *Brighton, supra,* is inapplicable to this situation.

*N.J.S.A.* 12A:3–406 requires that the payor bank "pay[ ] the instrument in good faith and in accordance with ... reasonable commercial standards." *N.J.S.A.* 12A:4–406(3) requires that the payor bank exercise "ordinary care ... in paying the item(s)." Midlantic Bank failed to meet the standards of both statutes. Payor banks have a duty to ascertain the identity of the payee. While payor banks are not in a position to determine the authenticity of an endorsee's signature, they can and should verify whether the endorsement matches the payee name. The *Hanover* court explained:

> We find the [payor] bank's position that it has no duty to examine the check as to the named payee to be totally unacceptable. The [payor] bank has a duty to make payment only to the payees named in its depositors' checks or to their order. Consequently, the [payor] bank as a general rule has a duty to determine the identity of the payee.
>
> [482 *F.Supp.* at 505.]

Accordingly, Midlantic Bank had a duty to examine the endorsements as the payor bank.

Given the tremendous volume of checks that must be processed by even the smallest of banks, whether sight review of checks should be required in the modern banking era is a difficult issue, but not an issue that this Court must resolve. The trial court, in finding that Midlantic Bank failed to exercise ordinary care, did not impose a general duty on all banks to inspect endorsements visually. As the trial court found, Midlantic Bank had voluntarily

assumed a certain standard of care in promulgating written policies and procedures for accepting checks. Under Midlantic Bank's procedures, the patent discrepancy between the payee name and the account name required Midlantic Bank to reject the deposit or at the very least to make further inquiries about the identity of the payee. Hence, Midlantic Bank breached its duty of care when its tellers failed to follow its own official procedures. Therefore, this Court should not disturb the trial court's finding that Midlantic Bank failed to exercise ordinary care when it accepted for deposit checks that its own written procedures required it to reject.

In conclusion, Midlantic Bank failed to exercise ordinary care in paying the items at issue and thus may not invoke N.J. Steel's negligence in defense. Midlantic Bank is therefore strictly liable for paying items that were not "properly payable." Under both N.J.S.A. 12A:3-406 and 4-406, such negligence removes any defense that Midlantic Bank might have against N.J. Steel. Therefore, the customer's assertion of contributory negligence by the bank allows "the loss [to] remain where it has fallen"—on Midlantic Bank. Although the result might seem unjust, it is in accordance with the law governing the claims at issue as well as with the particular facts of this case where defendant bank was "doubly negligent" as a payor and depository bank to its customers. As this type of "double agent," Midlantic Bank had two opportunities to catch the fraud perpetrated by Warburton on N.J. Steel before the reconciliation agreement directed N.J. Steel to review carefully its monthly statement. Because Midlantic Bank failed to conform with commercially reasonable banking standards and to exercise ordinary care, we affirm the judgments of both the trial court and the Appellate Division.

We note that the Legislature passed and the Governor on February 15, 1995, signed into law S. 344, now L. 1995, c. 28, that revises Articles 3 & 4 of the UCC and embraces the spirit of comparative negligence. However, that Act does not take effect

until the first day of the first calendar month which follows the 90th day after enactment.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.