692 A.2d 86

TRUMP PLAZA ASSOCIATES, D/B/A TRUMP PLAZA HOTEL AND CASINO, PLAINTIFF–APPELLANT, v. JAMES HAAS, JR., DEFENDANT, AND MERIDIAN BANK, NEW JERSEY, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 3, 1997—Decided April 24, 1997.

Before Judges HAVEY, BROCHIN and EICHEN.

*Lauri A. Hudson* argued the cause for appellant (*Slater, Tenaglia & Kanowitz*, P.A., attorneys; *Ms. Hudson*, on the brief).

*Nicholas Deenis* argued the cause for respondent (*Stradley, Ronon, Stevens & Young, LLP*, attorneys; *Mr. Deenis*, on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

Plaintiff Trump Plaza Associates, d/b/a Trump Plaza Hotel and Casino (Trump), appeals from a summary judgment dismissing its complaint against defendant Meridian Bank, New Jersey (Meridi-

an). In its complaint, Trump alleges that Meridian unlawfully stopped payment on a personal money order the bank had issued to a James Haas, Jr., in the amount of $35,000. Haas cashed the personal money order at Trump's casino for gaming proceeds. Trump returned the money order to Meridian, the drawee bank. Meridian refused to honor the money order, marking it "payment stopped," since Haas had insufficient funds in his account with Meridian to cover the $35,000 instrument.

In dismissing the complaint, the motion judge concluded that the money order was a personal check and that Meridian had not "accepted" it under the provisions of the Uniform Commercial Code (UCC), former *N.J.S.A.* 12A:3–409(1).

On appeal, Trump argues that: (1) Meridian could not stop payment on the money order, "prejudicing the rights of a holder in due course"; (2) Meridian "accepted" the money order by marking it "payment stopped" and by use of its printed name and logo on the face of the instrument; (3) as a holder in due course, Trump "should not suffer due to Meridian's negligence" in issuing the instrument; and (4) *Newman v. First Nat'l State Bank of Toms River,* 173 *N.J.Super.* 598, 414 *A.*2d 1367 (App.Div.1980), relied on by the motion judge, is distinguishable or should be overturned. We reject the arguments and affirm.

On December 13, 1994, Haas deposited two checks in the amount of $20,000 and $22,000, respectively, into the Meridian account of J.E. Haas–Mid–Way Equipment Co. The checks were drawn on a Mid–Way Equipment Co. account at Commerce Bank. Meridian credited the J.E. Haas–Mid–Way Equipment Co. account for the full amount of the two checks and forwarded them to Commerce Bank for payment.

On December 15, 1994, Haas purchased a $35,000 personal money order from Meridian. Meridian's name and logo are printed on the upper left-hand side of the money order. The money order is also stamped: "NOT VALID FOR MORE THAN $35,000." It is made payable to the order of "Jim Haas"; it is not

clear from the record when the name of the payee "Jim Haas" was inserted.

Haas signed the money order in the bottom right-hand corner of the document. On December 15, 1994, he presented the signed instrument to Trump and was given $35,000 in cash for use at Trump's gaming tables.

On December 16, 1994, the Mid–Way Equipment Co. checks drawn on the Commerce Bank account were returned to Meridian unpaid with a notation that the Mid–Way Equipment Co. account had been closed. Meridian debited its J.E. Haas–Mid–Way Equipment Co. account for the amount of the returned checks which resulted in a $38,584 overdraft. On December 20, 1994, Trump presented Haas' personal money order to Meridian for payment. Meridian dishonored the order, placing a "payment stopped" notation on it, since the J.E. Haas–Mid–Way Equipment Co. account contained insufficient funds to cover the amount of the money order. It was thereupon returned to Trump's bank.

As stated, the motion judge held that the personal money order was a personal check as opposed to a cashier's check and that Meridian, as the drawee, was not liable on the money order until it accepted it. He found that Meridian did not accept the money order merely because its name is printed on the face of the order or because it had stamped "payment stopped" on its face when the money order was dishonored. The judge also observed that he was bound by *Newman, supra,* 173 *N.J.Super.* at 604, 414 *A.*2d 1367, which held that a personal money order is a check and that a bank should not be deemed to have accepted a money order merely because its name and logo are printed on the face of the instrument.

A personal money order has been described as an instrument "for the convenience of anyone who does not have an ordinary checking account and needs a safe, inexpensive and readily accepted means of transferring funds." *Sequoyah State Bank v. Union Nat'l Bank of Little Rock,* 274 *Ark.* 1, 621 *S.W.*2d 683, 684 (1981)

(Dudley, J., dissenting).[1] There is a public perception that personal money orders are the equivalent of cash or have the credit of the issuing bank behind them. *See Unger v. NCNB Nat'l Bank,* 540 *So.*2d 246, 247 (Fla.Dist.Ct.App.1989); *Mirabile v. Udoh,* 92 *Misc.*2d 168, 399 *N.Y.S.*2d 869, 869 (N.Y.Civ.Ct.1977); *First Nat'l Bank of Nocona v. Duncan Sav. & Loan Ass'n,* 656 *F.Supp.* 358, 363 (W.D.Okl.1987), *aff'd,* 957 *F.*2d 775 (10th Cir.1992); Daniel E. Murray, *Revised Articles 3 and 4 of the Uniform Commercial Code: A Friendly Critique,* 47 *U. Miami L.Rev.* 337, 342 (1992). However, this perception is at odds with legal reality.

> One glance at the typical mail order catalogue or newspaper and magazine advertisements for mail order merchandise shows that merchants typically equate money orders with certified and cashier's checks; merchants who will not accept personal checks are happy to accept money orders. To their misfortune, this confidence is misplaced.
>
> *[Ibid.]*

Prior to the 1995 revisions of Articles 3 and 4 of the UCC (L.1995, c. 28), *N.J.S.A.* 12A:3–101 to *N.J.S.A.* 12A:4–504,[2] personal money orders were not defined and thus were considered something of a "maverick" instrument. *Newman, supra,* 173 *N.J.Super.* at 601, 414 *A.*2d 1367. However, we held in *Newman, supra,* that a personal money order "has the characteristic of a

---

[1] For a discussion of negotiable instruments generally and the treatment of money orders, see J.P. Ludington, Annotation, *Construction and Effect of UCC Art. 3, Dealing with Commercial Paper,* 23 A.L.R.3d 932, 940–60 (1969) and (1996 Supp.), and see Sheldon R. Shapiro, Annotation, *Uniform Commercial Code: Bank's Right to Stop Payment on Its Own Uncertified Check or Money Order,* 97 A.L.R.3d 714 (1980) and § 6 (1996 Supp.).

[2] In 1990, the American Law Institute and the National Conference of Commissioners on Uniform State Laws promulgated proposed revisions to Articles 3 and 4 of the UCC. The revision of Article 3 "attempts to resolve the problem of how to handle instruments like personal money orders" for which there previously were no special provisions, resulting in differing treatment by the courts. Robert G. Ballen, *et al., Commercial Paper, Bank Deposits and Collections, and Other Payment Systems,* 45 *Bus. Law* 2341, 2361 (1990). On June 1, 1995, the revisions to Articles 3 and 4 of Title 12A became effective in New Jersey. L.1995, c. 28. The parties agree that these revisions are not directly pertinent to this case because the action arose before the effective date of the revisions.

check in that it constitutes 'a draft drawn on a bank and payable on demand.'" *Ibid.* (quoting former *N.J.S.A.* 12A:3–104(2)(b)).

Former *N.J.S.A.* 12A:3–409, effective during the pertinent time period here, provided that a drawee bank will not be liable on an unaccepted check or draft:

(1) A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he *accepts* it.

. [ (Emphasis added).]

Former *N.J.S.A.* 12A:3–410(1) defines "acceptance" as:

the drawee's signed engagement to honor the draft as presented. It must be written on the draft, and may consist of his signature alone. It becomes operative when completed by delivery or notification.

Moreover, under the former *N.J.S.A.* 12A:3–401, no person is liable on an instrument unless his signature appears thereon. A signature is made by use of any name, "including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature." Former *N.J.S.A.* 12A:3–401(2).

■ This statutory scheme makes clear that, despite a payee's expectation that the drawee bank will pay a check, the bank has no obligation to the check holder to pay it unless and until the bank has accepted it. *See* 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 16–6a n. 2 and § 16–6b (4th ed.1995). Even if the drawee "arbitrarily dishonors a check, the payee or holder ordinarily has no cause of action against the drawee bank on the instrument." *Id.* at § 16–6b.

We applied these former provisions of the UCC in *Newman, supra,* where defendant Lois Sykes purchased a money order and sought to stop payment on it after it was lost. 173 *N.J.Super.* at 600, 414 *A.*2d 1367. The issuing bank stopped payment and the individual who had cashed the money order sued the bank for its face amount. *Id.* at 600–01, 414 *A.*2d 1367. Observing that a personal money order is the equivalent of a personal check, we held that payment may be stopped on the money order if it had not been paid, accepted or certified. *Id.* at 601–03, 414 *A.*2d 1367 (citing former *N.J.S.A.* 12A:4–403(1)). We reasoned:

> Although acceptance of an instrument is generally manifested by such words as "accepted" in the case of a draft, or "certified" in the case of a check, the Code expressly provides that an acceptance may consist of the drawee's signature alone. *N.J.S.A.* 12A:3–410(1). However, it is essential that the instrument at least contain the signature of the drawee. See 2 Anderson, *Uniform Commercial Code* (2 ed.1971), § 3–410:6 at 978; *N.J.S.A.* 12A:3–401(1). The money order purchased by Sykes was not signed by any authorized representative of the bank, nor did it bear the signature of the bank. The mere fact that the printed name of the bank appeared on the face of the money order was not sufficient to constitute its signature and therefore was not an acceptance of the instrument for payment within the purview of *N.J.S.A.* 12A:3–401(1). Consequently, Sykes, as the purchaser of the money order, had the right to stop payment.
>
> [*Newman, supra,* 173 *N.J.Super.* at 604, 414 *A.*2d 1367.]

Further, we held that issuance of a personal money order, "just as any check or draft," did not of itself constitute an assignment of funds in the hands of the bank available for its payment. *Ibid.* (citing former *N.J.S.A.* 12A:3–409(1)). We therefore concluded that the "bank was not liable on the instrument until it accepted it." *Ibid.*

■ We agree with the motion judge that *Newman* is dispositive. Although *Newman* involved a customer's stop-payment, and not a stop-payment or dishonor by the drawee bank, its holding turns on the concept of "acceptance" of the personal money order by the drawee bank as a predicate to its obligation to honor the instrument. That analysis applies here. Meridian did not "accept" or "certify" the personal money order prior to its dishonor. There is no "signature" of Meridian on the face of the instrument, nor is there any other indication that Meridian "assented in writing to the order of the drawer." New Jersey Study Comment 1 on former *N.J.S.A.* 12A:3–410. The mere fact that Meridian's name and logo were printed on the instrument "was not sufficient to constitute its signature and therefore was not an acceptance of the instrument for payment within the purview of *N.J.S.A.* 12A:3–401(1)." *See Newman, supra,* 173 *N.J.Super.* at 604, 414 *A.*2d 1367. In our view, the name and logo were nothing more than a commercially acceptable means of identifying the institution issuing the instrument.

■ Further, we reject plaintiff's argument that Meridian accepted the money order by stamping "payment stopped" on its face. Meridian's action in stamping the money order "payment stopped" is in fact a clear and obvious indication of an intent to dishonor the instrument, and nothing more. It logically cannot be deemed to constitute acceptance. Moreover, the fact the money order was stamped "NOT VALID FOR MORE THAN $35,000" does not change the result. This notation can be fairly deemed merely as an expression of limitation on the authority of the party signing and delivering the money order. It certainly cannot be deemed a "signed engagement to honor the draft as presented." Former *N.J.S.A.* 12A:3–410(1).

■ Finally, we reject Trump's argument that acceptance is shown by the fact that the purchase of the money order was a "sale" and that the money order was drawn not on Mid–Way Equipment Co.'s, but Meridian's account. In *Newman, supra,* we did not focus upon the fund created to pay the money order. Instead, we adopted the rationale of *Garden Check Cashing Serv., Inc. v. First Nat'l City Bank,* 25 *A.D.*2d 137, 267 *N.Y.S.*2d 698, 702–03, *aff'd o.b.,* 18 *N.Y.*2d 941, 277 *N.Y.S.*2d 141, 223 *N.E.*2d 566 (1966), that in purchasing a money order an individual deposits a sum with a bank and essentially receives one blank check. *Newman, supra,* 173 *N.J.Super.* at 601–02, 414 *A.*2d 1367; *contra Rose Check Cashing Serv., Inc. v. Chemical Bank New York Trust Co.,* 40 *Misc.*2d 995, 244 *N.Y.S.*2d 474, 477 (N.Y.Civ.Ct.1963), *aff'd,* 43 *Misc.*2d 679, 252 *N.Y.S.*2d 100 (N.Y.Sup.1964) (holding that no deposit is created upon the issuance of a money order because it is in the nature of a sale. Instead, the funds to pay the money order immediately come within the bank's exclusive control and ownership).

The 1995 revisions to Articles 3 and 4, although not directly applicable here, lend support to our holding and the continued viability of *Newman*'s analysis and result. Revised *N.J.S.A.* 12A:3–104f defines a check to include a money order: "An instrument may be a check even though it is described on its face by

another term, such as 'money order.' " The UCC comment 4 to revised *N.J.S.A.* 12A:3–104 explains:

"Money orders" are sold both by banks and non-banks. They vary in form and their form determines how they are treated in Article 3. The most common form of money order sold by banks is that of an ordinary check drawn by the purchaser except that the amount is machine impressed. That kind of money order is a check under Article 3 and is subject to a stop order by the purchaser-drawer as in the case of ordinary checks. *The seller bank is the drawee and has no obligation to a holder to pay the money order.*

[ (Emphasis added).]

As one author noted, the revisions to Article 3 of the UCC support a bank's right to dishonor a money order if it has not accepted it.

[T]he inclusion of personal money orders within the definition of an ordinary check (at Revised section 3–104(f)) rather than inclusion as a form of cashier's check (at section 3–411) means that such money orders are subject to customer stop payment orders and can be dishonored like an ordinary check. This applies only to money orders signed by the purchaser as drawer; of course a bank money order or similar bank draft (drawn by the issuing bank) would be treated as a cashier's or teller's check.

[Alvin C. Harrell and Fred H. Miller, *Symposium: Checking and Savings Accounts, Deposits and Payment Transactions, Part Two—The New UCC Articles 3 and 4: Impact on Banking Operations*, 47 *Consumer Fin. L.Q. Rep.* 283, 286 (1993).]

*Accord* Arthur G. Murphey, Jr., *Revised Article 3 and Amended Article 4 of the Uniform Commercial Code: Comments on the Changes They Will Make*, 46 *Ark. L.Rev.* 501, 526–27 (1993).

■ It is true that a number of courts have held that a personal money order should be treated like a cashier's check; therefore, a bank, on its own initiative, may not stop payment on a personal money order it has issued. *See e.g., Sequoyah State Bank, supra,* 621 *S.W.*2d at 684; *Unger, supra,* 540 *So.*2d at 247; *Rose Check Cashing Serv., Inc., supra,* 244 *N.Y.S.*2d at 477; *Interfirst Bank Carrollton v. Northpark Nat'l Bank of Dallas,* 671 *S.W.*2d 100, 103 (Tex.App.1984). *Cf. State ex rel. Babcock v. Perkins,* 165 *Ohio St.* 185, 134 *N.E.*2d 839, 842 (1956) (holding that a bank money order is equivalent to a cashier's check and is issued by the bank and paid from the bank's funds).

In our view, these cases should be given little weight. As stated, the revisions to Article 3 of the UCC that define a personal money order as a check mean that the purchaser or drawer of a personal money order may stop payment on it and "the drawee may dishonor it without liability to the holder." Murphey, *supra*, 46 *Ark. L.Rev.* at 526. Thus, these revisions would change the reasoning and the result of such cases as *Sequoyah State Bank*, *supra*. *Ibid.*

Trump next argues that, as a holder in due course of the money order "it should not suffer due to Meridian's negligence in issuing the instrument as [Meridian] did not follow its own procedure nor use ordinary care." This claim is predicated on the fact that Meridian purportedly failed to follow its own internal procedures requiring that, before a money order is sold, there are sufficient funds in the customer's account to cover it.

Trump's status as a holder in due course meant that it took the instrument free from essentially all claims by others and all defenses of any party to the instrument with whom the holder has not dealt. Former *N.J.S.A.* 12A:3–305; *see also* comments on former *N.J.S.A.* 12A:3–305. But these rights and protections do not come into play unless and until the drawee bank accepts the instrument. *See* former *N.J.S.A.* 12A:3–409(1) and revised *N.J.S.A.* 12A:3–408. Absent acceptance of the instrument by Meridian, Trump's sole remedy is against Haas, the drawer of the purchase money order.

Moreover, we are satisfied that any claim of negligence based on Meridian's failure to adhere to its internal procedures was subsumed by former *N.J.S.A.* 12A:4–402, which makes a payor bank liable to its "customer" for damages proximately caused by the "wrongful dishonor of an item." Only the purchaser of a personal money order, the "customer," has a claim when the dishonor occurs through the "mistake" of the payor bank. *Ibid.* Compare revised *N.J.S.A.* 12A:4–402 ("A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item"). And *see* comments to revised *N.J.S.A.* 12A:4–402.

It is true that *N.J.S.A.* 12A:1–103 provides that "principles of law and equity" supplement the UCC, unless displaced by particular provisions. *Accord Western Union Tel. Co. v. Peoples Nat'l Bank in Lakewood,* 169 *N.J.Super.* 272, 276, 404 *A.*2d 1178 (App.Div.1979); *Demos v. Lyons,* 151 *N.J.Super.* 489, 499, 376 *A.*2d 1352 (Law Div.1977). This provision may be interpreted as permitting a claim of negligence under the UCC absent a specific provision preempting such a claim. But a party asserting that a bank has acted negligently must demonstrate that the bank owed a duty to that party which has been breached, *Pennsylvania Nat'l Turf Club, Inc. v. Bank of W. Jersey,* 158 *N.J.Super.* 196, 203, 385 *A.*2d 932 (App.Div.), *certif. denied,* 77 *N.J.* 506, 391 *A.*2d 520 (1978), and that there is a causal connection between the bank's action and the party's loss. *Western Union Tel. Co., supra,* 169 *N.J.Super.* at 276, 404 *A.*2d 1178.

Plaintiff relies on *New Jersey Steel Corp. v. Warburton,* 139 *N.J.* 536, 655 *A.*2d 1382 (1995), for the proposition that Meridian owed such a duty and breached it in failing to follow its internal procedures. However, *New Jersey Steel Corp.* is inapposite. That case involved a scheme conceived by defendant Warburton under which, as an independent consultant, he stole checks from New Jersey Steel, forged them and deposited them into his personal account. *Id.* at 539, 655 *A.*2d 1382. New Jersey Steel's claim against defendant Midland Bank, the depository-payor bank, was that it had accepted the forged checks for deposit without following its own procedures for inspection of check endorsements. *Id.* at 538, 655 *A.*2d 1382. The bank's liability was predicated on the violation of two specific provisions of the UCC: (1) former *N.J.S.A.* 12A:4–406(3), involving the bank's lack of ordinary care in "paying the item(s)"; and (2) former *N.J.S.A.* 12A:3–406, in negligently contributing to the making of an unauthorized signature. *Id.* at 544–45, 655 *A.*2d 1382. *New Jersey Steel Corp.* is distinguishable because here Meridian breached no statutory standard of care owed to its customer expressly established by the UCC.

Affirmed.